99 P.2d 454

**HALE** et al. v. FARMERS ELECTRIC MEMBERSHIP CORPORATION.

No. 4485.

Supreme Court of New Mexico.

Feb. 15, 1940.

A. W. Hockenhull, of Clovis, and Harry C. Lamberton, of Washington, D. C., for appellant.

Wesley Quinn, of Clovis, for appellees.

BICKLEY, Chief Justice.

The plaintiffs (appellees) are the operators of two, single wire, grounded telephone systems operating in the counties of Curry and Quay, and have been giving telephone service to rural residents for several years.

The defendant, consisting of some 600 farmers in said counties, are organized into a rural electrical non-profit association and incorporated under the provisions of Chap. 100 of the N. M. Session Laws of 1937. The defendant secured a permit to construct its electric power system from the Rural Electrification Administration, a federal agency, and a loan in furtherance thereof.

At the time this suit was commenced, defendant had constructed about 125 miles of power line under government supervision and the farmer members of the corporation also had caused their residences to be wired in order to receive service, and on December 2, 1938, electrical energy was turned on and on the same day the plaintiffs filed this suit and secured a temporary injunction, and the electricity was turned off from said date until the injunction was dissolved on January 5, 1939.

On the last mentioned date the court entered its judgment in which was incorporated findings of fact. Material portions thereof are to the effect that the telephone lines of the plaintiffs have been erected and in use for many years prior to the installation of the defendant's rural electrical power system installed in the fall of 1938; that both the telephone lines of plaintiffs and

power lines of the defendant parallel each other at various places with only the width of the highway separating them. Findings numbers VI and VII are as follows:

"VI. That the installation and operation of the said power lines in close proximity to the said telephone lines causes an' inductive interference which greatly hampers the use of the said telephone lines and that this situation can be eliminated only by the installation of repeating coils at each end of the lines where the power lines and the telephone lines parallel and by the installation of a second wire making what is known as a metallicized area at the said parallels.

"VII. That the costs of said installation on the telephone lines would be $873.00 for both telephone lines."

The court dissolved the injunction, but granted damages against defendant and in favor of plaintiffs in an amount sufficient to defray the expenses of metallicizing certain area of plaintiffs' telephone system to overcome inductive interference with the use of the telephone lines said by plaintiffs to have been the result of the installation of the electrical power line by the defendant.

We find in the transcript of the record that there was filed in the office of the Clerk of the District Court on April 27, 1939, a paper entitled "Memorandum Opinion". This was more than three months after the judgment was entered and the appeal allowed therefrom to this court. This paper purports to contain certain additional findings of fact, some of which are inconsistent with the findings contained in the final judgment and some of which purport to find facts not contained in the findings of fact which were incorporated in the' judgment. Since this paper was filed subsequent to the written decision which contained the findings of fact upon which such decision was based and subsequent to the appeal, it is manifest that we may not consider it upon this review.

As we proceed to a decision, it must be kept in mind that no negligence, no unskillfulness, no malice is charged in the complaint of the plaintiffs in the construction, maintenance or operation of defendant's electrical power line and none was found by the court, and from aught that appears the defendant has constructed and was operating its power line in accordance with the best and most modern methods.

An examination of the record brings us to the conclusion that the learned trial judge proceeded upon the theory that the telephone system of plaintiffs, being the first in the field occupying the highway lawfully, was entitled to continue to serve its patrons without any interference with its service by a subsequent electric power company, regardless of the possibility and probability of the junior licensee reasonably avoiding the interference through proper construction of its own system.

The court seems to have been influenced to its decision by an application of the maxim, "Sic utere tuo ut alienum non laedas",

commonly translated, "So use your own as not to injure another's property".

We find such an extensive reference to this maxim running through many of the decisions invoked in the briefs that it seems worthwhile to give it some consideration before proceeding further. We quote from the article entitled "The Use of Maxims in Jurisprudence", pages 13, 14, 17, Vol. 9, Harvard Law Review:

"Perhaps no legal phrase is cited more frequently than Sic utere, etc. It is not uncommon for judges to decide important cases without practically giving any reason save the quotation of this maxim, which is evidently regarded by the court as affording, by its very terms, a satisfactory ratio decidendi. Yet in the vast majority of cases this use of the phrase is utterly fallacious. * * *

" 'The maxim Sic utere tuo ut alienum non laedas, is iterated and reiterated in our books, and yet there is scarcely an aphorism known to the law the true application of which is more vague and undefined. Interpreted literally it would enjoin a man against any use of his own property which in its consequences might injuriously affect the interest of others; but no such legal principle ever existed.'

" 'While, therefore, Sic utere tuo, etc. may be a very good moral precept, it is utterly useless as a legal maxim. It determines no right; it defines no obligation.' Selden, J., in Auburn & C. Plank Road Co. v. Douglass, 9 N.Y. 444, page 445, 446.

" "The maxim Sic utere tuo ut alienum non laedas, as commonly translated ("So use your own as not to injure another's"), is doubtless an orthodox moral precept; and in the law, too, it finds frequent application to the use of surface and running water, and indeed generally to easements and servitudes. But strictly, even then, it can mean only, "So use your own that you do no legal damage to another's." Legal damage, actionable injury, results only from an unlawful act. This maxim also assumes that the injury results from an unlawful act, and paraphrased means no more than: "Thou shalt not interfere with the legal rights of another by the commission of an unlawful act," or "Injury from an unlawful act is actionable." This affords no aid in this case in determining whether the act complained of is actionable, that is, unlawful. It amounts to no more than the truism: An unlawful act is unlawful. This is a mere begging of the question; it assumes the very point in controversy, and cannot be taken as a ratio decidendi." (Ingersoll, Sp. J., in Payne v. W. & A. R. Co., 13 Lea, Tenn., 507, pages 527, 528 [49 Am.Rep. 666].)"

There are many decisions holding that one is entitled to make a reasonable use of one's own property, even if such use incidentally injures his neighbor. See Niagra Oil Co. v. Jackson, 48 Ind.App. 238, 239, 91 N.E. 825; Joyce, Law of Nuisances, Sec. 29.

In Rose v. Socony-Vacuum Corp., 1934, 54 R.I. 411, 173 A. 627, 629, the court said: "The plaintiffs lean heavily on the maxim

sic utere tuo ut alienum non laedas. This maxim, so often cited as the governing principle of decisions, affords little, if any, aid in the determination of the rights of parties in litigation. If it be taken to mean any injury to another by the use of one's own, it is not true, and, if it means legal injury, it is simply a restatement of what has already been determined. 'The maxim, sic utere tuo ut alienum non laedas, is mere verbiage. A party may damage the property of another where the law permits; and he may not where the law prohibits: so that the maxim can never be applied till the law is ascertained; and, when it is, the maxim is superfluous.' Erle, J., in Bonomi v. Backhouse, El. Bl. & El. 622, p. 643; 2 Austin, Jur.(3rd) 795, 829. The maxim is undoubtedly a sound moral precept expressing an ideal never fully attained in the social state."

In Booth v. Rome, W. & O. T. R. Co., 140 N.Y. 267, 277, 35 N.E. 592, 595, 24 L.R.A. 105, 37 Am.St.Rep. 552, it was said: "The test of the permissible use of one's own land is not whether the use or the act causes injury to his neighbor's property, or that the injury was the natural consequence, or that the act is in the nature of a nuisance, but the inquiry is, was the act or use a reasonable exercise of the dominion which the owner of property has by virtue of his ownership over his property? Having regard to all interests affected, his own and those of his neighbors, and having in view, also, public policy."

In determining the reasonableness of the use of one's property, the courts regard a failure to do everything commercially practicable to prevent injury to another beyond what the fair necessities of the business require as an important factor pointing to an unreasonable use. De Blois v. Bowers, D.C.,1930, 44 F.2d 621; McCarty v. Natural Carbonic Gas Co., 1907, 189 N.Y. 40, 81 N.E. 549, 13 L.R.A.,N.S., 465, 12 Ann.Cas. 840; Sprague v. Sampson, 1921, 120 Me. 353, 114 A. 305; Dauberman v. Grant, 1926, 198 Cal. 586, 246 P. 319, 48 A.L.R. 1244; Keiser v. Mahanoy City Gas Co., 1891, 143 Pa. 276, 22 A. 759.

Where damage is avoidable only at a cost so prohibitive as practically to deprive the defendant of the use of his property, equity will not enjoin such use, nor, in the absence of actual trespass, will the defendant be liable in damages, although the court may cast upon the defendant the burden of showing the economic necessity for his acts. Thus in Beecher v. Dull, 1928, 294 Pa. 17, 143 A. 498, a suit to enjoin blasting in a quarry on property adjoining a house belonging to the plaintiffs, the court spoke as follows, at page 499 of 143 A.: "The arguments presented on this appeal involve mainly a construction of the principles announced in Pennsylvania Coal Co. v. Sanderson, 113 Pa. 126, 6 A. 453, 57 Am. Rep. 445, * * * on the one hand, and in Pfeiffer v. Brown, 165 Pa. 267, 30 A. 844, 44 Am.St.Rep. 660, * * * on the other hand. The former class of cases applies the rule that damages resulting to another from a natural and lawful use by a person of his own premises are, in absence of malice or negligence, damages without

remedy, while the latter adopts the common-law principle that one must so use his property as not to injure that of another. Cases necessarily arise where these two opposing rules conflict, and when this occurs the right to use one's own property must prevail, providing the resulting damage to another cannot be avoided, or only at such expense as would be practically prohibitive to a person in the enjoyment of his own land. * * *" This thought is reflected in the expression of our legislature relative to eminent domain pertaining to right of way for use of waters in Sec. 151-103, N.M.S.A., where the injunction is. to "do the least damage to private or public property *consistent with proper use and economical construction*". (Italics supplied) .

The considerations embodied in the decisions in the foregoing cases, which constrain the courts to decide what is, or is not, a permissible use of one's property, are reflected in numerous decisions on the precise question now presented for adjudication.

In Lake Shore & M. S. Ry. Co. v. Chicago, L. S. & S. B. Ry. Co., 1911, 48 Ind. App. 584, 92 N.E. 989, 95 N.E. 596, the plaintiff instituted injunction proceedings against the defendant railroad to restrain the operation of its cars for the reason that the high tension currents of electricity used by defendant greatly interfered with the maintenance and use of plaintiffs' electric telephone lines and signals. The court, in holding that the railroad company was not liable unless it had exceeded its rights,

been negligent in construction, used faulty or improper appliances or in some way unnecessarily caused injury, stated in 92 N.E. page 990: "So a man may do many things under a lawful authority, or in his own land, which may result in an injury to the property of others, without being answerable for the consequences. Indeed, an act done under lawful authority, if done in a proper manner, can never subject the party to an action whatever consequences may follow. A man may enjoy his land in the way such property is usually enjoyed, without being answerable for the indirect or consequential damages which may be sustained by an adjoining landowner. It follows that the maxim, 'Sic utere,' etc., is undoubtedly to be so limited in its application as not to restrain the owner of property from a prudent and reasonable exercise of his right of dominion. If in the exercise of his right another sustains damage, it is damnum absque injuria, for in the matter of things and society it is not reasonable that every annoyance should constitute an injury such as the law will remedy or prevent. * * *" The court expressly repudiated the applicability of the doctrine of Rylands v. Fletcher, L.R. 1 Ex. 263, of liability without fault for injury resulting from the escape of unnatural substance brought on land, stating at page 990 of 92 N.E.:

"It must be kept in mind that neither negligence nor unskillfulness nor malice is charged in the construction, maintenance, or operation of appellee's line of railway, and that appellant is basing its right to relief solely upon the broad principle that

'one who for his own purpose brings upon his land and conducts and keeps thereon things likely to do mischief, if it escapes, is prima facie answerable for all the damage which is the natural consequence of its escape.' Fletcher v. Rylands.

\* \* \*

"This controversy is between users of electricity; appellant using light currents, and comparatively delicate instruments, which are interrupted by escaping currents from the wires carrying exceedingly high voltage belonging to the appellee. It is not a question between one engaged in the ordinary development of his land and the customary and appropriate employment of it according to its inherent qualities and its surroundings, without bringing upon it artificially of any substance not naturally found there \* \* \* and one engaged in the unnatural and extraordinary use of his property, calling for the application of the maxim 'Sic utere tuo,' etc., which is the governing principle in Fletcher v. Rylands. \* \* \* In this case the use of electricity is common to both parties, and both are acting under legislative grants. In such cases it seems to be the consensus of opinion, both in England and in this country, that where one is acting under legislative authority, and within the right thus given, and reasonably within the exercise thereof, using care and caution regarding the rights of his neighbor, any inconvenience or incidental damage which may arise in the absence of any negligence from the reasonable use of his own property will be regard-

ed as within the rule damnum absque injuria. \* \* \*"

The reasoning of the above case was followed in Postal Telegraph-Cable Co. v. Pacific Gas & Electric Co., 1927, 202 Cal. 382, 260 P. 1101, at page 1102, 56 A.L.R. 414, the court saying:

"\* \* \* the respondent maintains that a distinction exists between cases where a plaintiff has been making an ordinary use of his property and is prevented from doing so by inductive interference, and cases where both plaintiff and defendant are making an extraordinary use of their property and inconvenience results to one in this extraordinary use of his property by reason of the use of the other. The case of Eastern and S. A. Tel. Co. v. Cape Town Tram Co. (1902) C.C. 381, 2 British Ruling Cases, 114, 126, contains the following language:

" 'A man cannot increase the liabilities of his neighbor by applying his own property to special uses, whether for business or pleasure. The principle of Ryland v. Fletcher, which subjects to a high liability the owner who uses his property for purposes other than those which are natural, would become doubly penal if it implied a liability created and measured by the nonnatural uses of his neighbor's property.'

"In the instant case the use of each party is extraordinary, and each makes a similar use, though different in degree. The distinction between the rights of parties thus situated and the respective rights of parties where one is engaged in the ordinary devel-

opment of his land and the other is subjecting his land to an extraordinary use is pointed out in the case of Lake Shore & M. S. Ry. Co. v. Chicago, etc., Ry. Co. * * *."

There are many authorities to the effect that the rule imposing liability for damage naturally arising out of the extraordinary use of property does not apply in cases of inductive interference where both parties have applied their properties to an extraordinary use as the parties have done in the case at bar, and this rule is applied irrespective of priority of occupancy where the interference is reasonably unavoidable. See Phillippay v. Pacific Power & Light Co., 1922, 120 Wash. 581, 207 P. 957, 211 P. 872, 23 A.L.R. 1251; Yamhill County Mut. Tel. Co. v. Yamhill Electric Co., 1924, 111 Or. 57, 224 P. 1081, 33 A.L.R. 373; Georgia Power Co. v. Parker, 1934, 48 Ga.App. 807, 173 S.E. 730; Southwestern Public Service Co. v. Moore, 1930, 119 Tex. 391, 29 S.W. 2d 329.

The defendant power company is under no legal duty to select a type of power system the primary purpose of which is to facilitate telephone communication in the vicinity of its electric lines. The defendant has a right, in designing its power system, to design a type of system which accords with the best modern engineering standards for the accomplishments of its intended purpose, i. e., to supply electric service in rural areas, and its whole duty toward the plaintiff is to avoid all unnecessary crossings, conflicts and inductive exposures and to apply such mitigative measures on its own lines that may· exist and that are determined to be the best engineering solution to the interference problem. In Yamhill County Mutl. Tel. Co. v. Yamhill Electric Co., 111 Or. 57, 224 P. 1081, 33 A.L.R. 373, plaintiff sued to enjoin an electric company from constructing and operating a power line paralleling plaintiff's grounded telephone line so as to interfere with plaintiff's service. The court, in holding the defendant not liable in so far as it constructed its power line along the highway in accordance with the best and most modern methods, interfering with the operation of the plaintiff's line as little as possible, spoke in part as follows in 224 P. page 1082: "As to conflicting franchises and operations it is said in effect that, while an electric company occupying the streets under its franchise has no exclusive right of occupancy against a subsequent licensee thereof, yet, as between electric companies exercising similar franchises in the same street or highway, priority of franchise and occupancy carries with it superiority of right to the extent that the subsequent licensee is under the duty so to construct its system as not unnecessarily to interfere with the prior licensee in the exercise of its franchise. * * * The rights of the first licensee are not exclusive. So long as it is not disturbed in its occupancy, it must submit to such unavoidable inconvenience as may result from a fair and reasonable exercise of the junior licensee's franchise. * * * In case the interference may be avoided by the installation of devices or

other means, it is the duty of the later company to adopt such means * * *. The junior licensee is not bound to experiment with recent inventions not generally known; the practicability and expense of safe methods of overcoming the interference must be considered with reference to the fact that the science of electricity is still in its experimental stage and with the possibility that the legal objections of the parties may change with the progress of invention. * * *"

■ It seems unnecessary to multiply citations. The student will find in Southwestern Public Service Co. v. Moore, supra [119 Tex. 391, 29 S.W.2d 332], an extensive list of cases cited to the holding "The decided weight of authority sustains the proposition of nonliability for such injury in the absence of negligence or malice". And also therein a sufficient answer to the suggestion that priority in time of location of a telephone company's lines is sufficient to create liability on the part of the power company for alleged inductive or conductive interference of electrical energy from its subsequently located power line. If prior location of a telephone company's lines in a highway alone were held sufficient to create liability on the part of a power company for inductive interference of electrical energy from its subsequently located power line, then would not the priority of location by one day be as good as ten years to create such liability? If that were the law, then might not a telephone company, which in the race for priority of establishment succeeded by one day, be able to construct its lines in an out-moded and deficient and unskillful manner in order to cast the burden upon the power company to bear the expense of bringing the telephone company's lines up to a standard of efficiency it should have established in the first instance? We think these queries illustrate the unsoundness of the argument made by appellees.

The appellees lean heavily upon the decision of the South Dakota Supreme Court in Dakota Cent. Tel. Co. v. Spink County Power Co., 42 S.D. 448, 176 N.W. 143. In that case a telephone company operating a one-wire, ground-return circuit procured a judgment against a power company for the cost of metallicizing its telephone lines. The court therein recognized that at common law the telephone company must suffer the interference with its service or abandon the use of the earth as a return circuit and at its own expense install a metallic-return circuit over certain lines interfered with. The court, however, felt that the common law rule had been abrogated in South Dakota by a statute conferring on defendant and similar companies a right to use the highway, but containing the following proviso: "Provided that such transmission line shall not interfere with the *service* of any telephone or telegraph lines already constructed on such highways." (Italics supplied) Laws 1913, c. 369, § 1. It was thought by the prevailing justices that the legislature by prohibiting interference with the "service" rather than physically with the lines of systems of tele-

phone and telegraph companies clearly had inductive interference in mind. Even so, it seems to us that Whiting, J., dissenting, presented the sounder argument. If the statute in question is construed to prohibit *any* interference, it necessarily bars later transmission lines from using highways occupied by return telephone lines, and thus denies a right intended to be conveyed by the legislature. To say that telephone companies must allow their lines to be metallicized at the expense of power companies later entering the field is inconsistent with the position that a telephone company, being the prior occupant of the public highway, is entitled to operate ground-return telephone lines, and that late comers must not interfere therewith. We would not ordinarily draw upon a dissenting opinion for argument to support our views, but the present circumstances present a justifiable exception, because the Supreme Court of South Dakota six years later, in the case of Dakota Cent. Telephone Co. v. Shipman Const. Co., 49 S.D. 251, 207 N.W. 72, 73, decided that the state, by granting a telephone company right to use a highway, did not divest itself of its power to maintain such highway, and that neither the state nor the contractor grading the highway under contract with the highway commission is liable to telephone company for damages necessarily done to its line *without negligence,* and in the course of the opinion said: "Indeed in the dissenting opinion in Dakota Cent. Tel. Co. v. Spink County Power Co., 42 S.D. 448, 176 N.W. 143, analogous principles were considered, and

it was made plain in the majority opinion that the dissenting opinion would have prevailed save for the statute there in question." We take time with this case because we will shortly have our own statute to consider. In the South Dakota case first referred to above Whiting, J., said [42 S.D. 448, 176 N.W. 146]:

"* * * If my Colleagues are right in their construction of the proviso, it necessarily follows that appellant's theory was correct, and the only power of the court is to grant it, the very relief prayed for in its complaint—an absolute and perpetual injunction against respondent, forbidding it to use its lines as high power lines. Under my Colléagues' construction of this proviso, it would not make any difference how the telephone line was constructed. No matter if, owing to faulty construction of the telephone system, the power line could not be operated without causing electric interference, both by conduction and induction, with the service, howsoever poor, rendered the patrons of the telephone system, yet, under their construction of the proviso, the power company would have no right (because there is no corresponding duty on the part of the telephone company) to even, at it own expense, put the telephone line into such a condition as would eliminate such interference.

*   *   *

"What is the nature and extent of that duty that rests upon those to whom is given the right to occupy public highways and to construct thereon public service systems?

The authorities cited by my Colleagues give full support to the thoughts I desire to suggest.

"Just as the dedicator of the highway must be held to dedicate it for all purposes consistent with its use as a highway—and this whether all of such purposes to which the state may thereafter desire to devote it are known at the time of the dedication— so a public service person or body, which occupies a highway for public service purposes, must be held to have placed its property thereon under the implied condition that it would so maintain and operate its property as to meet and conform to human progress; and therefore would, from time to time, make such changes in its property and the use thereof as might be found necessary to meet changed conditions brought about by the occupancy of such highways by other public service persons or bodies. This is but requiring of public servants that which is required of the private individual. When the automobile came into use, the drivers thereof did not have to bring the horse and ox into adjustment with the new conditions any more than they had to give over half of the road to old 'Dobbin.' The proper use of the automobile could never be held an 'interference' with the rights of man or beast— they must adjust themselves to the new conditions. Primitive man did not have to wait on the corner until the congestion of autos, trucks, and street cars ended and a way opened through which he might dart across a street; but the man, woman, and child of to-day has to so wait.

\* \* \*

"Appellant company received its franchise from the public, the state; it holds such franchise in trust for the benefit of those communities it undertakes to serve; it has no right, simply because, at the time it first occupies a highway, there may be nothing to prevent the operation of its line without a return metallic circuit, to say that it becomes vested with a right to thus operate for all time and thereby to deny to the very communities it has undertaken to serve the enjoyment of public utilities that are open to the enjoyment of other communties that may not have already been blessed by appellant's presence. The Legislature never intended to allow it thus to throw a wrench into the wheels of human progress. I apprehend that appellant would be in court, crying aloud for relief, if, perchance, it desired to install one of its low power lines along a highway already occupied by respondent, and it found respondent had so constructed or was so operating its line that, through faulty construction, unbalancing of loads, or failure to properly transpose wires, a condition existed under which, even with a metallic return circuit, appellant could not operate a low power line along such highway. If it would be the duty of respondent, if it had been first in the field, to make necessary changes to permit of the advent of appellant into the same field, there is a like duty on appellant's part. There can be no 'interference' while this duty remains unperformed if its performance would eliminate the trouble."

Many other illustrations will occur to the reader which will indicate that the legislature never intended to allow the senior licensee to enjoy a monopoly and to throw a wrench into the wheels of human progress. It is familiar history that the motor busses and trucks "interfered" with the railroads in their business of transporting passengers and freight, but we have never heard it suggested that the bus and truck lines were liable for the expense the railroad companies were put to in meeting the competition. In 33 C.J. 267, defining interference, we find the following drawn from a leading case: "Every man's business is liable to be 'interfered with' by the action of another, and yet no action lies for such interference. Competition represents 'interference', and yet it is in the interest of the community that it should exist. A new invention utterly ousting an old trade would certainly 'interfere with' it. Every organiser of a strike, in order to obtain higher wages, 'interferes with' the employer carrying on his business; also every member of an employers' federation who persuades his co-employer to lock out his workman must 'interfere with' those workmen. Yet I do not think it will be argued that an action can be maintained in either case on account of such interference." Allen v. Flood, (1898) A.C. 1, 179, 17 E. R. C. 285.

The appellees put their faith in the South Dakota decision because our statute, Sec. 32-1333 of the 1938 Supplement to the 1929 Codification (Laws 1937, Ch. 100, § 10), says that a corporation such as the defendant has power "To construct or place any part or parts of a system or systems across, in or along any street or public highway, or over any lands which are now or may be the property of this State or any political subdivision thereof without obtaining any franchise or other permit therefor, Provided, however, the same shall be constructed in such manner as not to interfere with any existing system or systems * * *." There is a controversy between the parties as to whether the foregoing language covers telephone systems or whether it is limited to electrical power systems. Assuming that the admonition extends to telephone systems it is to be noted that our statute apparently with nice discrimination omits the word "service", which points to a recognition of the principle frequently applied that the junior licensee must not interfere with the occupancy of the highway and public places enjoyed by the senior licensee. In other words, there must be no interference by the junior licensee with the physical property of the senior licensee. Yamhill County Mut. Tel. Co. v. Yamhill Electric Co., supra, Southwestern Public Service Co. v. Moore, supra. We think that the most the appellees may contend for is that the legislature intended to adopt or give approval to the maxim, Sic utere tuo, etc., and that the statute should be construed as an admonition against *unreasonable interference* with the service of the senior licensee; Western Union Tel. Co. v. Electric Light & Power Co., 178 N.Y. 325, 70 N.E. 866, or that the junior licensee must not *unduly* interfere. Thus, we find the law stat-

ed in Cumberland Tel. & Tel. Co. v. Louisville Home Tel. Co., 114 Ky. 892, 72 S.W. 4, 6: "* * * Appellant's franchise was not exclusive. Its prior occupation of a particular space entitled it to the continued enjoyment of that space without substantial impairment by appellee; but this enjoyment is subject to such incidents as result from the exercise of the rights of appellee under its franchise, for it is necessarily implied in the grant to appellee that it is subject to such limitations as will enable another to enjoy a like franchise. Otherwise the right of the first company obtaining a grant would amount to a monopoly. This was not intended. The grant to appellant is like other privileges in the public ways. It must be exercised in such a way as not unduly to interfere with the rights of others. * *" (Italics supplied)

Our legislature has elsewhere recognized the fact that some interference may result when two or more public service companies are operating in the same area. Section 151-103, N.M.S.A.1929, controlling the right of eminent domain, includes "the right to enlarge existing structures, and to use the same in common with the former owner; any such right-of-way for canal, ditch, pipe line, or other means for the conveyance of water shall in all cases be so located as to do the *least* damage to private or public property *consistent with proper use and economical construction.*" (Italics supplied) Sec. 43-110 provides that no telephone or telegraph company shall, by virtue of the chapter on eminent domain, be authorized to erect poles so near to the property of others "as *materially* to inconvenience the owner in their use or to occasion injury thereto". Sec. 43-112 provides that in case lands sought to be appropriated are held by any public utility corporation, the right to appropriate the same by railroad, telephone or telegraph company shall be limited to such use "as shall not *materially* interfere with the uses to which, by law, the corporation holding the same is authorized to use the same".

Viewing the statute invoked by appellees in the light of reason we hold that it must be interpreted as meaning that the system of the junior licensee shall be constructed in such manner as not to materially or unreasonably interfere with any existing system, and in this case it not appearing that the defendant power company has constructed and operated its power line in other than a skillful manner in accordance with the best and most modern methods, it does not appear that the interference complained of by plaintiffs is actionable.

Appellant complains that the trial court erroneously refused to award damages to it growing out of the temporary injunction. We do not find that appellant has cross-appealed or otherwise presented a record authorizing us to review this error, if error it was.

From all of the foregoing it appears that the trial court erred in awarding damages to the plaintiffs and against defendant, and

that the judgment must be reversed and the cause remanded, and

It is so ordered.

BRICE, ZINN, SADLER, and MABRY, JJ., concur.