GAINEY v. FOLKMAN.

Civ. No. 1859.

United States District Court
D. Arizona.

July 14, 1953.

232

Snell & Wilmer, by Mark Wilmer, Phoenix, Ariz., for plaintiff.

William C. Eliot, Moore & Romley, by Elias M. Romley, Phoenix, Ariz., for defendant.

YANKWICH, Chief Judge.

By his complaint, the plaintiff seeks to recover damages for injury to his cattle and injunctive relief against further "dusting" of cotton on the defendant's ranch, which lies across a road from plaintiff's ranch. It is his contention that the dusting has caused some of the alfalfa on his ranch to become impregnated. As some of the cattle graze on this alfalfa and other cut alfalfa is fed to them, it is insisted by the plaintiff that the poisoning from such impregnation is responsible for the "unthrifty" condition of his herd. This condition appeared only after the dusting in August of 1952. Injury and annoyance to the employees of his ranch are set forth as is also their continuous character. The defendant has denied the allegations. Before discussing the proof we advert to certain principles which govern cases of this type.

I

### Interference With Use of Land

An ancient maxim which has become a part of the common law reads:

"Sic utere tuo ut alienum no laedas."

Its literal translation is

"So use your own as not to injure others (property)."

As given effect in Anglo-American jurisprudence, it is a limitation upon the use of one's property.[1] Resort to it by courts as an absolute criterion of liability has been the subject to a good deal of criticism.[2] The classic illustration of the application of the principle in modern times is a famous English case.[3] In that case the owner of a mill constructed a reservoir upon his land. When the water was turned into the reservoir, it broke shafts on adjoining land under which mines had been worked and flooded the mines. The Court found the mill owner liable. The gist of the decision is contained in the following brief statement by The Chancellor (Lord Cranworth):

"If a person brings, or accumulates, on his land anything which, if it should escape, may cause damage to his neighbour, he does so at his peril. If it does escape, and cause damage, he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent the damage.

"In considering whether a Defendant is liable to a Plaintiff for damage which the Plaintiff may have sustained the question in general is not whether the Defendant has acted with due care and caution, but whether his acts have occasioned the damage. This is all well explained in the old case of Lambert v. Bessey, reported by Sir Thomas Raymond * * *. And the doctrine is founded on good sense. For when one person, in managing his own affairs, causes, however innocently, damage to an-

1. 66 C.J.S., Nuisances, § 8, pp. 740–741; 80 C.J.S., Sic, pp. 1274–1276.

2. Jeremiah Smith, The Use of Maxims in Jurisprudence, 1895, 9 Harv.L.Rev. 13, 14–17; Hale v. Farmers Electric Membership Corp., 1940, 44 N.M. 131, 99 P. 2d 454, 455–459.

3. Rylands v. Fletcher, 1868, L.R. 3 H.L. 330.

other, it is obviously only just that he should be the party to suffer. He is bound *sic uti suo ut no laedat alienum.*" [4]

The House of Lords with the limitations of an appellate court, confined its language to the specific facts before it. However, the Judge who tried the case below, Mr. Justice Blackburn, with the greater freedom of a trial judge, gave expression to the variety of situations to which the doctrine promulgated would apply and under which many unnatural and unreasonable use of one's land could be made the basis of liability if damage resulted to the adjoining land.[5]

[redacted] This case was the starting point of a theory of liability which sought to depart from the old rule which postulated liability only upon the existence of fault or negligence. It envisaged situations where, despite the absence of fault or negligence, the use of one's property might be detrimental to others. Today the trend is to fasten liability if the result of the use constitutes a nuisance as to the adjoining owner. And, in determining whether the use made of the property is reasonable, relief will be granted if, notwithstanding the lawful nature of the activity conducted, and the fact that, in itself, it is not a nuisance, injury results to others. The Supreme Court of Arizona has given recognition to this modern application of the ancient maxim in determining the effect of the operation of a smelter upon the adjoining property owner:

"Operating a smelter is a perfectly lawful business and necessarily not a nuisance per se, but notwithstanding this the right to operate one, like the right to pursue any legitimate course of action, must be exercised in the light of the maxim, 'So use your own property as not to injure the rights of another.' Bohan v. Port-Jervis Gas-Light Co., 122 N.Y. 18, 25 N.E. 246, 9 L.R.A. 711. A business may be perfectly legitimate in itself and yet constitute a nuisance as to persons who are specially injured by it. Arizona Copper Co. v. Gillespie, 230 U.S. 46, 33 S. Ct. 1004, 57 L.Ed. 1384. So, the operation of a smelter, in itself entirely lawful, becomes a nuisance if it discharges into the air poisonous gas and smoke which are carried by the wind currents over and upon the premises described in the complaint and occasion damage thereto. * * * And it is immaterial where the smelter is located if it discharges the poisonous fumes at a point from whence they are taken by

4. Rylands v. Fletcher, supra, pp. 340–341.

5. As quoted by the Lord Chancellor (Lord Cairns) in Rylands v. Fletcher, supra, pp. 339–340:

"We think that the true rule of law is, that the person who, for his own purposes, brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril; and if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape. He can excuse himself by shewing that the escape was owing to the Plaintiff's default; or, perhaps, that the escape was the consequence of vis major, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just. The person whose grass or corn is eaten down by the escaping cattle of his neighbour, or whose mine is flooded by the water from his neighbour's reservoir, or whose cellar is invaded by the filth of his neighbour's privy, or whose habitation is made unhealthy by the fumes and noisome vapours of his neighbour's alkali works, is damnified without any fault of his own; and it seems but reasonable and just that the neighbour who has brought something on his own property (which was not naturally there), harmless to others so long as it is confined to his own property, but which he knows will be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property. But for his act in bringing it there no mischief could have accrued, and it seems but just that he should at his peril keep it there, so that no mischief may accrue, or answer for the natural and anticipated consequence. And upon authority this we think is established to be the law, whether the things so brought be beasts, or water, or filth, or stenches."

the processes of nature to the premises injured by them." [6]

Other courts have applied it to similar situations,[7] and to a variety of cases, such as injuries resulting from the operation of a factory which increased the fire hazard in the vicinity,[8] and to cases involving the use of water on one's land so that it inundates neighboring land.[9] Indeed, the courts, by a broad interpretation of the law of nuisances, have granted relief either by way of damages or by injunction, if no appreciable damage resulted, where activities were conducted upon a man's land which interfered with the proper enjoyment of the use of his property by the adjoining owner.[10]

## II

### Crop "Dusting"

The case before us involves the application of the principles just declared to a factual situation. So much so that at the trial, it was assumed by both sides that these principles, referred to by the court, were applicable. And the sole question for determination is whether the facts in the case warrant the granting of the relief asked by the plaintiff.

For several years the plaintiff has owned a cattle ranch of several hundred acres in Paradise Valley, Arizona. As most land in the district, it is irrigable land. Some three hunderd acres are planted to alfalfa,

which is used to feed the cattle which are kept on the place. The surplus crop of alfalfa is very substantial and is sold to neighboring ranches and others, bringing in between $20,000 and $25,000 each year. Among the purchasers of this alfalfa is the defendant, a fact the significance of which will be pointed out later in the discussion. The plaintiff raises Hereford cattle chiefly for breeding purposes, although some are sold for beef. While there is disagreement as to the money value of the Hereford stock, all are in accord that it is a high-grade of cattle which, especially if registered, commands high prices for breeding purposes.

During the years 1951 and 1952, with which this lawsuit is concerned, the plaintiff's Hereford herd averaged 80 animals. The entire livestock population on the ranch was around 200. In 1950, the defendant turned some raw land in the same valley, located across the road from plaintiff's ranch, into a cotton field. There is evidence that the plaintiff did not like the prospect of having cotton cultivation adjoining his project. His foreman so stated. Indeed, a green alfalfa field upon which blooded Hereford stock is raised is much more picturesque than the brown stalks of a matured cotton field. But courts, except in extreme cases involving the presence of factories and garages in residential districts [11] will not interfere with

6. United Verde Extension Mining Co. v. Ralston, 1931, 37 Ariz. 554, 296 P. 262, 264–265.

7. United Verde Copper Co. v. Ralston, 9 Cir., 1931, 46 F.2d 1; E. Rauh & Sons Fertilizer Co. v. Shreffler, 6 Cir., 1943, 139 F.2d 38.

8. Vowinckel v. N. Clark & Sons, 1932, 216 Cal. 156, 13 P.2d 733.

9. Allen v. Stowell, 1905, 145 Cal. 666, 669, 79 P. 371, 68 L.R.A. 223; 66 Am.Jur., Waters, Secs. 432–433.

10. 66 C.J.S., Nuisances, §§ 8–9; Restatement, Torts, Secs. 822–831, and especially introductory note to Chapter 40, pp. 222–225; Hale v. Farmers Electric Corp., supra, Note 2; Dix W. Noel, Nuisances from Land, 1943, 56 Harv.L.Rev. 772. As to the application of these principles when both land owners are using their property for unusual and extraordinary

purposes, see, Postal Telegraph-Cable Co. v. Pacific Gas & Elec. Co., 1927, 202 Cal. 382, 260 P. 1101, 56 A.L.R. 414. And see, Hale v. Farmers Electric Corp., supra, Note 2; Henry T. Terry, Proximate Consequence in the Law of Torts, 1914, 28 Harv.L.Rev. 10; James Angell McLaughlin, Proximate Cause, 1925, 39 Harv.L.Rev. 148.

11. See, Yeager v. Traylor, 1932, 306 Pa. 530, 160 A. 108. And see, Dix W. Noel, Unaesthetic Sights as Nuisances, 1939, 25 Corn.L.Q. 1. "It is not within the judicial scheme [of things] to make things pleasant * * * for all the citizens of the state." Wescott v. Middleton, 1887, 43 N.J.Eq. 478, 483, 11 A. 490, 493. "Mere esthetics is beyond the power of a court." Perry Mount Park Cemetery Ass'n v. Netzel, 1936, 274 Mich. 97, 99, 264 N.W. 303.

the ordinary use of a person's land merely because it may shock the aesthetic sensibilities of his neighbor. The objection of the plaintiff to the growing of cotton in his neighborhood was confirmed by the acts of his own foreman and manager of the ranch.

The plaintiff is a non-resident, a citizen and resident of the State of Minnesota who carries on his operations in Arizona through others and only visits his ranch occasionally,—never, as a matter of fact, staying on the place over night. The foreman testified that in 1951 he asked the defendant to seed to alfalfa six acres near his house, so as to be parallel with the alfalfa on the plaintiff's ranch in the locality where the foreman's house was located. When the defendant agreed to this, the foreman put in the alfalfa, paying all costs, including the cost of seed. This fact has no great significance in the determination of this case, except that it points to the fact that disaffection with the nature of the crop grown on the defendant's ranch may have influenced the plaintiff's attitude. All agree that an owner of agricultural land cannot tell his neighbor what to plant. Except where restrictive covenants exist, Courts will not interfere to satisfy the artistic or aesthetic desire of neighboring land owners, especially in agricultural areas.[12]

In the cultivation of his cotton, the defendant, in 1951 and 1952, began "spraying" (dusting) the crop with chemicals, which are commonly known as DDT (the chemical name for which is dichloro-diphenal-trichloroethane), Ben-Hex (the chemical name for which is gama isomer of benzine hexachloride), and Parathion (the chemical name for which is O, O-diethyl O-p-nitrophenil thiophosphate).

The spraying was by what is known as "the dusting" method. In it the chemicals are sprayed upon the cotton by ejection from the pit of an airplane which flies low over the field at an altitude of about three feet from the top of the cotton plants. As the cotton plants at the usual time of spraying,—the months of July and August—are about three feet high, the plane circles at an altitude of about six feet. The chemicals are ejected downward towards the plants. A load of a thousand pounds is carried at one time. Of the 1,200,000 arable acres of land under irrigation in the State of Arizona, 670,000 acres are in cotton. Of this amount, 200,000 acres are in Maricopa County. Cotton is infested by various insects, among the most common one is one known popularly as "the stink bug" (order Hemiptera). They puncture the bolls and suck the juices from the seed; thus reducing the quality of the seed and the cotton produced from the bolls. It is common knowledge that full cotton crop potentials cannot be realized unless these and other insects are controlled. The method of control is the application of chemicals, among which the three mentioned are the best known and have the approval of the United States Department of Agriculture and Arizona State and University authorities on cotton growing and leading entomologists. Spraying by machinery on the field is not satisfactory and no adequate machine has been evolved to date to achieve the result. So the method is through "dusting" from low-flying airplanes which sweep the fields. Ninety per cent of the cotton crops in Arizona and in Maricopa County are treated in this manner. July and August are the preferred months because of the condition of the cotton crop at that time, and also because the intense heat

---

12. The rule is not so strictly applied when dealing with adjoining residential property:

"Happily, the day has arrived when persons may entertain appreciation of the aesthetic and be heard in equity in vindication of their love of the beautiful, without becoming objects of opprobrium. Basically, this is because a thing visually offensive may seriously affect the residents of a community in the reasonable enjoyment of their homes, and may produce a decided reduction in property values. Courts must not be indifferent to the truth that within essential limitations aesthetics has a proper place in the community affairs of modern society." Parkersburg Builders Material Co. v. Barrack, 1937, 118 W.Va. 608, 612–613, 191 S.E. 368, 371, 192 S.E. 291, 110 A.L.R. 1454. And see, State ex rel. Carter v. Harper, 1923, 182 Wis. 148, 159, 196 N.W. 451, 455, 33 A.L.R. 269.

of the season reduces the likelihood of surplus chemicals drifting on to other lands. The method has the approval not only of cotton growers in Arizona, but is the preferred method recommended by the United States Department of Agriculture, the Extension Service of the University of Arizona maintained by the State of Arizona to assist cotton growers. The chemicals are toxic, but they are recommended for the purpose by both federal and state agricultural agencies and others. While some documentary and oral evidence in the record shows that users of these chemicals have been warned of their toxicity, no testimony was offered by the plaintiff that any authority, medical or other, has recommended against their use as insecticides. Indeed, there is no evidence in the record of injury to humans or cattle, except where the chemicals, and especially DDT, was ingested or absorbed in large quantities. Cattle sprayed directly with these chemicals, especially DDT, have shown no deleterious results. Nor have such results appeared when alfalfa sprayed with these chemicals, especially DDT, was fed to cattle.

These facts stand without dispute except insofar as they are challenged by the plaintiff in his action and by the testimony offered in support of it. To this we now direct our attention.

### III

### The Facts Reviewed

We consider the facts testified to in order to determine whether the plaintiff has been injured by the acts of the defendant in connection with the "dusting" of his crop.

There were three "dustings" in July and August of 1951 and four in the same months in 1952. The dustings were at an early hour in the morning. The chemicals were purchased by the defendant. The pilot of the airplane and his assistants appeared at the ranch early in the morning while it was still dark, and while the air was comparatively still. Witnesses for the plaintiff have testified that clouds of dust could be seen drifting from the defendant's ranch across the road towards the plaintiff's ranch, and that the eyes of some persons who were near the dusting smarted. The wife of the plaintiff's foreman, Beatrice Eilers, complained of an aggravation of an evidently pre-existing illness. This was confirmed by her physician, Dr. Ruth Huffman, an osteopathic physician, who testified that, in her opinion, the symptoms of which she complained were indicative of DDT poisoning. She was not an expert either in the field of toxicology or biology. No known tests were made upon the patient to determine the presence of toxic elements in her blood. Only the symptoms were described, which, in the opinion of the physician, were the result of exposure to the toxic chemicals with which the dusting was achieved. It is the contention of the plaintiff that the toxic character of the chemicals used and the absence of full knowledge or presence of uncertainty as to their effects would warrant the court is preventing the defendant from injecting the chemicals into the air over the plaintiff's ranch.

■■ Stated in this manner, the problem lacks realism. Even the most extreme application of the doctrine of Rylands v. Fletcher [13] would not warrant interference with a legitimate process, the dusting of plants of one's own property to control insect infestation. Theoretically, the owner of land is the owner of the atmosphere above it. The old maxim expressed it by extending such ownership to the skies, Cujus est solum ejus est usque ad coelum. An extreme interpretation of this right would forbid an airplane from crossing another person's land without permission. And yet, the Courts, viewing the problem realistically have not interfered with such crossing unless through unusual noises and other acts, they actually affect the enjoyment of the property by the others,[14] or result in acts which amount to an actionable nuisance calling for intervention by courts either through award of damages or injunctive relief. A person cannot delib-

13. Rylands v. Fletcher, supra, Note 2.
14. Restatement, Torts, Sec. 169, illustrations F., G. and H.; 2 C.J.S. Aerial Navigation, §§ 3–5; United States v. Causby, 1946, 328 U.S. 256, 260–261, 66 S.Ct. 1062, 90 L.Ed. 1206

erately impregnate the atmosphere over another man's land with chemicals which are dangerous to his livestock or humans residing there. But even smoke or the occasional escape of water to adjoining lands from irrigation, while technically a violation of the rights of the adjoining land owners, does not call for intervention by the Courts, unless substantial damages result from it and there is likelihood of injury either to the land or human beings residing on it.[15]

So the concrete question around which the determination of this case turns is, as stated in substance by me during the trial: Did the "dusting" actually damage the plaintiff?

This, in turn, depends upon the answer to another question: Did enough chemicals from the dusting or spraying in 1952 drift over to the plaintiff's field so that, when ingested or absorbed by the cattle directly and impregnated in the alfalfa pastured by or fed to the cattle, they caused their unthriftiness.

As already stated, no deleterious consequences to human beings or warm-blooded animals were discerned following the 1951 dustings. The testimony of many of the plaintiff's own lay witnesses, including the ranch manager's wife, may be dismissed as being an expression of that fallacy which is referred to in logic as *post hoc ergo propter hoc*. Translated into English, it means the fallacy of assuming that, because an event follows another, it is necessarily caused by it. The only testimony in this respect which showed any direct effect is that of witnesses who testified that when near the dusting, the drift of some of the chemicals made their eyes smart. But every person giving such testimony readily admitted that the discomfort was temporary and disappeared quickly.

The testimony of the osteopathic physician who treated the manager's wife is contradicted by a man of national reputation who is both a doctor of medicine and a nationally known toxicologist, Dr. J. I. Sealey. He testified that the symptoms which he heard the witness and her physician describe could be traced to other sources and that the chemicals referred to, DDT, Ben-Hex, and Parathion, in the quantities likely to impregnate adjoining land through drifting after "dusting" are not likely to produce any ill effect in either humans or other warm-blooded animals. This is confirmed by the bio-chemist called by the plaintiff as one of his last witnesses at the trial, on the last day of the trial, who testified that the quantity of DDT found in the tissues from a cow killed during the trial would not be injurious. This finding confirms the fact that no absorption was shown of the other two chemicals. The autopsy performed on the other animal during the course of the trial, a horse, disclosed no presence of any chemicals, although the veterinary who performed it insisted that certain of the horse's organs showed, in his opinion, the result of poisoning from these chemicals. As on five of the seven "dustings", DDT was used and Ben-Hex or Parathion on other occasions, the absence of any trace of these elements in the tissue of the animals warrants the conclusion that there was no impregnation, ingestion or absorption of the latter by the cattle. For it is conceded that the chemical analysis of blood or tissue will disclose

15. See cases cited in Note 10. See also, Dauberman v. Grant, 1926, 198 Cal. 586, 246 P. 319, 48 A.L.R. 1244; McIntosh v. Brimmer, 1924, 68 Cal.App. 770, 230 P. 203; Centoni v. Ingalls, 1931, 113 Cal.App. 192, 298 P. 47; 28 Am.Jur., Injunctions, Sec. 29; 43 C.J.S., Injunctions, §§ 21, 26; Northrop Corp. v. Madden, D.C.Cal.1937, 30 F.Supp. 993, 995.

The principle is well stated in 28 Am. Jur., Injunctions, Sec. 29:

"It is not every injury which will warrant the issuance of an injunction. It is a familiar principle that the remedy is available only where the injury is * * * substantial. Equity will not interfere by injunction where the damages suffered by the complainant are so small and the right invaded so unimportant as to make the case a trivial one. Nor will equity interfere to relieve against injuries which are trivial, technical or inconsequential * * *. It must be a material and actual injury existing or presently threatened and not one that is fanciful, theoretical, or merely possible, or that is doubtful, eventual, or contingent."

such impregnation. So, assuming that plaintiff's contention that the effect is cumulative is correct (a fact which is disputed by other authorities who testified in the case), the findings on the autopsies negative the presence of poisoning from Ben-Hex and Parathion.

And an impartial examination of the testimony before the Court on the subject of DDT leads to the inescapable conclusion that, assuming that large quantities of the chemicals drifted over to the plaintiff's place, which, as will appear later, is disputed by eye witnesses who conducted the spraying and remained on the ground hours after each operation was concluded, no poisoning resulted from the 1951 and 1952 dusting of the defendant's cotton crop. The undisputed fact is that, even when fed directly to warm-blooded animals, the effect of DDT disappears within thirty days.[16]

One other fact is very significant. The defendant bought alfalfa from the plaintiff after the dustings in 1951 and 1952, which he fed to some dozen head of cattle on his ranch. They showed no ill effects. At one time during the dusting, the airplane crossed over a fish pond. The pilot forgot to close the shutter which released the chemicals and the pond received the full share of them. On other occasions, the

16. "The results of these tests in which large amounts of DDT were administered to cows, horses, and sheep, as a dry powder or in water suspension, indicate that the chemical is not acutely toxic. Most of the material is evidently eliminated from the body, although small quantities may be taken up by the blood stream.

\* \* \* \* \* \*

"There is some indication that individual animals develop a tolerance to DDT, although much additional study is needed on this and other phrases of the problem. The effects of DDT dissolved in oils or other organic solvents should be determined, as it is possible that solutions of the chemical would be much more readily assimilated. The results of the present tests do not, however, give reason to expect any bad effects on domestic animals from the proper use of DDT as an insecticide when applied as a dust or in water suspension." W. L. Orr, The Effect of DDT Administered Orally to Cows, Horses and Sheep, 1945, 38 Journal of Economic Entomology, pp. 431–432.

"Lindane: We have just completed a two-year feeding study of lindane, the gamma isomer of benzene hexachloride, and on commercial benzene hexachloride. When we compare these results with similar studies conducted on DDT, we find that commercial benzene hexachloride required a moderately higher, and lindane a considerably higher dietary level to produce liver changes than does DDT. If we rate the toxicity of hexachloride $\frac{1}{2}$ and lindane a toxicity of $\frac{1}{4}$, or they are respectively $\frac{1}{2}$ and $\frac{1}{4}$ as toxic as DDT. Lindane is rapidly metabolized and does not accumulate in body fat, and on this basis we can see no objection to its use as a dairy barn spray. The spraying of lindane directly onto dairy cows causes the appearance of small amounts of the insecticide in the milk for the first 48 hours, and in view of Commissioner Dunbar's statement that 'the purity of milk must be safeguarded in every possible way' there would be objections to such use. Lindane has been suggested as a household spray. The formulations we have seen call for 0.1% lindane. In our opinion this concentration would be safe for household use.

\* \* \* \* \* \*

"Organic phosphates: During the past year parathion has received considerable publicity because of a few deaths of operators who were fatally poisoned while applying the material. This is actually a problem in industrial health and has no bearing on the residue hazard. Our view on residue hazards has not changed. Further toxicological work on parathion reveals that the compound is not cumulative as such. On the basis of the evidence we are still of the opinion that a dietary item containing 2–5 parts per million of parathion would not be a health hazard.

"We have continued our studies on the principal breakdown product of tetraethyl pyrophosphate, namely, diethyl-orthophosphoric acid. Subacute feeding of this compound at a level of 0.5 per cent for 20 weeks to rats produced no abnormalities in the animals. From this it appears that although tetraethyl pyrophosphate may be a hazard to personnel applying the insecticide, its rapid break-down in the presence of water to relatively nontoxic products minimizes the residue problem". Dr. Arnold J. Lehman: Some Toxicological Reasons Why Certain Chemicals May or May Not Be Permitted as Food Additives, 14 Bull.Ass. of Food and Drug Off., 1950, pp. 92–93.

pond being in the field, if we assume there was drifting of the chemicals, some of them must have drifted over the pond. Yet we have this significant fact. Some fish in a pond on the plaintiff's property died months after the dusting. The plaintiff attributes the death to the chemicals. Yet the defendant's fish who were exposed much more directly to the same chemicals, in the same vicinity, showed no ill effect whatsoever.

A similar situation arises as to some of the humans. Persons living near the defendant's ranch and working on it felt no effects from the dusting. A fourteen-year old boy, Fred Capps, Jr., who, with his family, lived on the plaintiff's ranch and who was a member of the 4–H Club, was placed in charge of a blooded calf from the plaintiff's herd, as is done in many instances by breeders with young boys aspiring to be "the future farmers of America". The calf was from the same herd which the plaintiff claims was injured by the chemicals. For nearly a year he fed the calf every day from the alfalfa which the plaintiff claims had been impregnated by the chemicals without any deleterious effect. On the contrary, the boy showed the calf first at a local fair and then at the Arizona State Fair and was awarded prizes.

And there is the testimony of the operator of a very large cattle ranch, James Benedict, that dusting of DDT directly on Hereford cattle and exposure of alfalfa on his ranch to the dusting of adjoining fields of cotton had no harmful effect on his herd. Of the 200 head of live stock which plaintiff had on his place, eighty of which were registered Herefords, it is claimed that only nineteen were affected. It is incredible that an exposure of all should not have affected them all in some discernible way. The fact that some of them only were affected and the greater number not at all, warrants the statement of some of the persons connected with the plaintiff's enterprise that the difficulties from which these young heifers were suffering may be traceable to the bull who sired them.

It is difficult to believe that the deleterious effects of this "dusting" should have become localized on the plaintiff's place and been confined to some members of the herd only and to some persons living on his place, and that a greater exposure because of the closer nearness to the "dusting" by persons and live stock on the defendant's ranch, should not have shown any effect of exposure. This fact warrants the conclusion that the injuries to animals and humans of which the plaintiff complains cannot be traced to the "dusting". Their origin must be sought elsewhere. And it is not the burden of the defendant to ascertain it. If we eliminate the testimony of the plaintiff's lay witness as being contradicted by others of equal, if not greater credibility, and the testimony of the osteopathic physician contradicted by a Doctor of Medicine, who is also a toxicologist of national reputation, there remains in the record the uncontradicted fact that warm-blooded animals in or about the same environs did not suffer any bad effect from either dustings. In the light of these facts, the opinion of the veterinary, Dr. A. Marion Smith, called in to examine the cattle, months after the exposure, that the pathological findings in the autopsy and the appearance of the two slaughtered animals and the other ailing ones which he examined were, in his opinion, caused by poisoning, loses all significance. So determined was he to uphold his opinion against the great weight of others who had knowledge of fields which were entirely foreign to him, that even after a biochemist called as a witness by the plaintiff in the concluding hours of the case, testified that a horse's tissue which, at Dr. Smith's request, he had examined, contained a residuum of DDT in a noninjurious quantity, he still maintained his conclusion of the "additive" effect of consecutive dustings. The answer to this assertion was given by two scientists who, although called by the plaintiff, were completely disinterested. One was Dr. F. C. Bishop, Assistant Chief, Entomology and Plant Quarantine, the second ranking official in the Department of Agriculture, a specialist in Animal Husbandry, connected with a federal institution, the aim of which is to investigate and report on the toxic effect of the use of chemicals in agriculture. The other is Dr. James N. Roney, equally expert, in charge

of the agricultural work of the University of Arizona and the State of Arizona. Both have made long studies about the toxic effects of chemicals used in agriculture. Both were familiar with the literature on toxicology and had participated in experiments with them and reported to various gatherings of agriculturists or scientists in the field as to methods to be employed. They testified that the dusting method used is the only practical one, that the amount of chemicals which are likely to escape and drift over a road to an adjoining ranch could not either by ingestion or absorption by cattle or by impregnating the alfalfa grazed by or fed to them, affect them injuriously.

## IV

### Conclusion

. ▮▮ The conclusion is, therefore, warranted that the plaintiff has failed to show that his cattle were injured by the "dusting" operations of which he complains or that such "dusting" affected injuriously the health of any of the persons on or about his ranch. More, the evidence justifies the conclusion that the "unthriftiness" noticed in some of the cattle and the physical discomfort felt by the ranch foreman's wife could not be caused by the "dusting" operations. As stated before, it was not the duty of the defendant to show what other conditions would or could have caused the injuries complained of. There is evidence from which the inference may be drawn that the poor quality of one bull may have been responsible for the "unthriftiness" of the heifer crop of 1952. And close friends of the foreman's wife, Henry E. Sutter and Katherine Sutter, testified that she was a sickly person and suffered what, to them, looked like the same symptoms long before her exposure to these chemicals. No deleterious effect seems to have been discernible even to the plaintiff's

witnesses, after the 1951 dusting, although the plaintiff has attempted to show that the effect in 1952 was cumulative because of previous exposures in 1951.

We repeat that there is no tangible, credible evidence to warrant such conclusion. It should be added that these dusting operations are not continuous. They are sporadic, carried on on a few occasions during two months of the year, July and August, when, as already stated, because of the state of the cotton crop and the hot weather, the insect incidence is great and requires action. The "dustings" are spaced about two weeks apart. The chemicals are shot on to the crop by airplanes sweeping the field at a time of day when very little,— a few pounds at most—are likely to drift away from the cotton. Because of the intense heat in Arizona during those months, the chemicals disappear very quickly from the atmosphere. So the following may be said in summation:

Grant that the operations will continue in the future at the same time of each year, including the current year. Concede also that plaintiff actually is of the view that they harm him. The fact is, however, that unless he traces to the dusting the "unthrifty" condition of his cattle and the consequent diminution of their sales value as blooded stock for breeding purposes, or can point directly to the same source as the cause of the discomfort and illness of which some of the members of the ranch family complain, he is not entitled to the relief he seeks, either by way of damages or injunction. This he has not done. And granted that he has misgiving or even fears that these "dustings" may actually be the cause of the injuries of which he complains, it is not the aim or within the power of courts of equity to use the injunctive process to allay the fears of a person.[17]

. Judgment will, therefore, be for the defendant.

17. Lorenz v. Waldron, 1892, 96 Cal. 243, 250, 31 P. 54. See the writer's opinion in Northrop Corp. v. Madden, D.C.Cal. 1937, 30 F.Supp. 993, 995; Orcutt v. Pasadena Land & Water Co., 1908, 152 Cal. 599, 601, 93 P. 497; Colorado Power Co. v. Pacific Gas & Elec. Co., 1933, 218 Cal. 559, 566, 24 P.2d 495; Walling v. T. Buettner & Co., 7 Cir., 1943, 133 F.2d 306. I have summed up this principle in two previous opinions in this manner:

"There must be clear and immediate danger or threat of real, not merely apprehended interference. Northport Power & Light Co. v. Hartley, 1931, 283 U.

S. 568, 51 S.Ct. 581, 75 L.Ed. 1275; Richmond Hosiery Mills v. Camp, 5 Cir., 1935, 74 F.2d 200. Mere fears are not enough. First National Bank v. Albright, 1908, 208 U.S. 548, 28 S.Ct. 349, 52 L.Ed. 614; Spielman Motor Co. v. Dodge [1935, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322]." Redlands Foothill

Groves v. Jacobs, D.C.Cal.1940, 30 F. Supp. 995, 1000.

"A court of equity cannot use its injunctive power to allay the fears of a litigant. * * * injunctive action is directed only against imminency." Skelly v. Dockweiler, D.C.Cal.1948, 75 F.Supp. 11, 16.