## CASCADE TOWN CO. v. EMPIRE WATER & POWER CO. et al.

### BIGGER v. SAME.

(Circuit Court, D. Colorado. October 3, 1910.)

1. WATER AND WATER COURSES (§ 35*)—APPROPRIATION OF WATER—RIPARIAN RIGHTS.

    There are no riparian rights in Colorado as against a valid appropriation of water.

    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 27, 28; Dec. Dig. § 35.*]

2. WATERS AND WATER COURSES (§ 132*)—APPROPRIATION OF WATER—PURPOSE —GENERATION OF ELECTRICITY.

    The impounding and piping of the waters of a creek to generate electricity to be sold to the public as a commodity is a valid appropriation of the waters under the Constitution and laws of Colorado.

    [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 132.*]

3. WATERS AND WATER COURSES (§ 128*)—UNAPPROPRIATED WATER—DEDICATION—CONSTITUTIONAL PROVISIONS.

    By Const. Colo. art. 16, §§ 5, 6, providing that the right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied, the people of the state dedicated to the public all unappropriated waters of every natural stream within its borders, and made the same subject to appropriation as private property.

    [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 128.*]

4. WATERS AND WATER COURSES (§ 132*)—APPROPRIATION—"BENEFICIAL USE."

    Complainant owned several hundred acres of land, which it improved at great expense for a summer resort. On the lands is Cascade Cañon through which a small, precipitous stream flows. The seepage from the flow of the stream and the mist and spray from its falls produces a luxuriant and exceptionally beautiful growth of vegetation on the floor and sides of the cañon, thus rendering the cañon and the stream with its falls flowing through it rare in beauty and the chief attraction of the resort, and they were so advertised by complainant. *Held*, that such use of the cañon and the stream and its falls therein constituted a "beneficial use" and operated as an appropriation of the waters in said stream within the requirements of Const. Colo. art. 16, § 6, conferring the right to divert the unappropriated waters of any natural stream to beneficial uses, and that said waters could not thereafter be impounded above the cañon and falls and piped away by defendant and used to generate electricity for sale as a commodity.

    [Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 132.*

    For other definitions, see Words and Phrases, vol. 1, p. 749.]

In Equity. Actions by the Cascade Town Company and by Leander A. Bigger against the Empire Water & Power Company and others. Decree for complainant Cascade Town Company, and bill of complainant Bigger dismissed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

E. F. Ware, for complainants.

R. L. Holland, for respondents.

I.

LEWIS, District Judge. Complainant, the Cascade Town Company, owns several hundred acres of land up Ute Pass, about eleven miles from Colorado Springs. Fountain Creek flows through Ute Pass in an easterly direction, and as it passes the lands of the complainant company its waters are augmented by those of Cascade Creek—short in length of flow but precipitous—which comes down from the watershed on the northerly slope of Pike's Peak to the westerly. The said complainant company and its predecessors in title have owned these lands for many years, and they began improving them as a summer resort more than twenty years ago, and have maintained them as such ever since and have not sought to utilize them otherwise. For that purpose they have constructed hotels there and built cottages, roads and trails on its lands extending up through Cascade Cañon, through which the stream of the same name flows, and on beyond into the mountains, laid out, dedicated to the public and improved a small park in said cañon, made a lake and fountain, built a pavilion or auditorium for conventions, and otherwise improved its grounds, thereby adding to the attractions of the place as left by nature. The complainant company and its predecessors are not, and were not, municipal corporations, but business ventures created for the purpose of maintaining their property as a resort for tourists during the summer season. The place is known as Cascade. The Midland Railway, which traverses Ute Pass, has a station there. The complainant company has sold some of its property to persons who desired to improve the same as summer homes, and the complainant Bigger has spent about $15,000 in improving his home on land bought from the company, lying on both sides of Cascade Creek just below the cañon. The company obtains an income from those who stop at its hotels and enjoy other accommodations which it offers. It has spent a large amount of money in improvements. The roads and trails up Cascade Cañon and on into the mountains were constructed at an expense of fifteen or twenty thousand dollars. It also built a small waterworks to supply the cottages and its hotels. It advertises the place for the purpose of inducing the public to go there, and for the past quarter of a century it has been visited annually by twelve or fifteen thousand people. It has a permanent population of fifty or sixty people. Among other attractions held out in its advertisements are Cascade Cañon and the falls of Cascade Creek through the cañon. The cañon and falls are rare in beauty and constitute the chief attraction. Without them the place would not be much unlike any other part of Ute Pass. The cañon is about three-quarters of a mile long and very deep; its floor and sides are covered with an exceptionally luxuriant growth of trees, shrubbery and flowers. This exceptional vegetation is produced by the flow of Cascade Creek through the cañon and the mist and spray from its falls. Some of these falls are as much as thirty feet in height, but the difference in elevation between the foot and the head of the cañon is

so great that the falls are almost continuous from the head down. The volume of water is the greatest during the summer season. It comes from the melting snows on the north slope of Pike's Peak. But the flow is fairly even, due to the fact that the upper stretches of the watershed are composed of disintegrated granite into which the water first sinks and gradually percolates until gathered into the bed of the stream. The volume is said to be equivalent to a stream about eight feet wide and six to eight inches in depth. The vegetation in the cañon and up its sides consists, in part, of pine, spruce, fir, balsam, aspen, black birch, Japanese maple, thimble berry, wild cherry, choke cherry, and aster, columbine, larkspur, wild rose, the red raspberry, wild gooseberry, ferns, mosses, and many other kinds of trees, shrubs and flowers. The stream is annually stocked with trout. The birds which are found in the cañon, some grouse, a few squirrels, and perhaps a few other wild animals there, are protected by the complainant company. The complainant called a florist of twenty-five years experience and a landscape gardener of thirty-five years experience as witnesses. They tell us that the native flora of the country is quite extensive in Cascade Cañon, that the evergreen features are perfect, that there are three or four varieties of pines, three of juniper and three of spruce, probably twenty-five varieties of native shrubs, about fifty varieties of native perennials, and several varieties of moss growth, and a large variety of wild flowers and flowering shrubs, that the waterfalls create a spray and mist which, together with the underground seepage down the sides of the cañon, produce this very luxuriant growth, there being at least two hundred varieties of vegetation, and that it is far superior in that respect to any other cañon in the neighborhood, and exceptional. The seepage and the mist and spray give life to the foliage.

The defendant was incorporated for the purpose, among other things, of generating electricity by water power, and to dispose of the same as a commodity; and to execute that purpose it sent its agents on to the watershed of Pike's Peak, above the head of Cascade Cañon, and located a reservoir site and did some acts, at small expense, looking to the execution of that purpose, whereby it intended and expected to impound the waters in such reservoir and later conduct it in pipes down the mountain to and beyond the property of the complainant company. And thereupon these complainants filed their several bills asking that the defendant be enjoined from so doing,—as a threatened injury to their vested rights.

It is found as a fact that if the defendant do impound the waters of Cascade Creek above the falls and conduct it therefrom in pipes as aforesaid, the falls in the cañon and the vegetation on its floor and sides will be largely, if not wholly, destroyed and the cañon hence become a dry gulch, and that all the waters flowing in said stream are needed by complainant company, and are necessary for the aforesaid purposes to which they have been applied by said complainant.

## II.

1. The first contention of both complainants is that the government, while it was the owner of the lands on which the cañon and the falls are situate, had riparian rights in the stream and that those rights were

conveyed by patent from it, and through mesne conveyances, to the complainants.

This contention cannot be accepted. There are no riparian rights in Colorado as against a valid appropriation of water.

In Sternberger v. Seaton Co., 45 Colo. 401, 404, 102 Pac. 168, 169, it is said:

"The doctrine in this state that the common law rule of continuous flow of natural streams is abolished, is so firmly established by our constitution, the statutes of the territory and the state, and by many decisions of this court, that we decline to reopen or reconsider it, however interesting discussion thereof might otherwise be, and notwithstanding its importance."

And again, page 403 of 45 Colo., page 169 of 102 Pac.:

"The Supreme Court of the United States, in several cases, has approved and indicated its satisfaction with the decisions of the state courts which hold that the common law doctrine has been abolished, and has said that each state, without interference by the federal courts, may for itself, and as between rival individual claimants, determine which doctrine shall be therein enforced."

In Coffin v. Left Hand Ditch Co., 6 Colo. 443, 446, it is said:

"It is contended by counsel for appellants that the common law principles of riparian proprietorship prevailed in Colorado until 1876, and that the doctrine of priority of right to water by priority of appropriation thereof was first recognized and adopted in the constitution. But we think the latter doctrine has existed from the date of the earliest appropriations of water within the boundaries of the state. The climate is dry, and the soil, when moistened only by the usual rainfall, is arid and unproductive; except in a few favored sections, artifical irrigation for agriculture is an absolute necessity. Water in the various streams thus acquires a value unknown in moister climates. Instead of being a mere incident to the soil, it rises, when appropriated, to the dignity of a distinct usufructuary estate, or right of property. It has always been the policy of the national, as well as the territorial and state governments, to encourage the diversion and use of water in this country for agriculture; and vast expenditures of time and money have been made in reclaiming and fertilizing by irrigation portions of our unproductive territory. Houses have been built, and permanent improvements made; the soil has been cultivated, and thousands of acres have been rendered immensely valuable, with the understanding that appropriations of water would be protected. Deny the doctrine of priority or superiority of right by priority of appropriaton, and a great part of the value of all this property is at once destroyed.

"The right to water in this country, by priority of appropriation thereof, we think is, and has always been, the duty of the national and state governments to protect. The right itself, and the obligation to protect it, existed prior to legislation on the subject of irrigation. It is entitled to protection as well after patent to a third party of the land over which the natural stream flows, as when such land is a part of the public domain; and it is immaterial whether or not it be mentioned in the patent and expressly excluded from the grant.

"The act of congress protecting in patents such right in water appropriated, when recognized by local customs and laws, 'was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one.' Broder v. Natoma W. & M. Co., 101 U. S. 274, 25 L. Ed. 790.

"We conclude, then, that the common law doctrine giving the riparian owner a right to the flow of water in its natural channel upon and over his lands, even though he makes no beneficial use thereof, is inapplicable to Colorado. Imperative necessity, unknown to the countries which gave it birth, compels the recognition of another doctrine in conflict therewith. And we hold that, in the absence of express statutes to the contrary, the first appropriator of water

from a natural stream for a beneficial purpose has, with the qualifications contained in the constitution, a prior right thereto, to the extent of such appropriation."

Congress, as early as 1866, recognized the necessity of the abolition of the common law doctrine of riparian rights in the arid states. Speaking of the act of July 26th, 1866, the Supreme Court, in U. S. v. Rio Grande Irr. Co., 174 U. S. 690, 704, 19 Sup. Ct. 770, 775, 43 L. Ed. 1136, said:

"The effect of this statute was to recognize, so far as the United States are concerned, the validity of the local customs, laws and decisions of courts in respect to the appropriation of water."

And again, at page 702 of 174 U. S., page 775 of 19 Sup. Ct. (43 L. Ed. 1136):

"While this is undoubted (the rule of the common law as to riparian rights). and the rule obtains in those states in the union which have simply adopted the common law, it is also true that as to every stream within its domain a state may change this common-law rule and permit the appropriation of the flowing waters for such purposes as it deems wise."

In Gutierres v. Albuquerque Land Co., 188 U. S. 545, 552, 23 Sup. Ct. 338, 341 (47 L. Ed. 588), it is said:

"We think, in view of the legislation of congress on the subject of the appropriation of water on the public domain, particularly referred to in the opinion of this court in U. S. v. Rio Grande Irr. Co., 174 U. S. 690, 704–706 [19 Sup. Ct. 770, 43 L. Ed. 1136], the objection is devoid of merit. As stated in the opinion just referred to, by the act of July 26th, 1866, 14 Stat. 253, congress recognized, as respects the public domain, 'so far as the United States are concerned the validity of the local customs, laws and decisions of courts in respect to the appropriation of water.'"

Also Clark v. Nash, 198 U. S. 361, 370, 25 Sup. Ct. 676, 679 (49 L. Ed. 1085):

"The rights of a riparian owner in and to the use of the water flowing by his land are not the same in the arid and mountainous states of the West that they are in the states of the East. These rights have been altered by many of the Western States, by their constitution and laws, because of the totally different circumstances in which their inhabitants are placed, from those that exist in the states of the East, and such alterations have been made for the very purpose of thereby contributing to the growth and prosperity of those states arising from mining and the cultivation of an otherwise valueless soil, by means of irrigation. This court must recognize the difference of climate and soil, which render necessary these different laws in the States so situated."

This question had direct consideration by the Circuit Court of Appeals for this Circuit in the case of Snyder v. Colorado Gold Dredging Co., 181 Fed. 62, opinion in which was filed August 4th, 1910. In that case it is said:

"The common law doctrine in respect of the rights of riparian proprietors in the waters of natural streams never has obtained in Colorado. From the earliest times in that jurisdiction the local customs, laws and decisions of courts have united in rejecting that doctrine and in adopting a different one which regards the waters of all natural streams as subject to appropriation and diversion for beneficial uses and treats priority of appropriation and continued beneficial use as giving the prior and superior right. Yunker v. Nichols, 1 Colo. 551; Coffin v. Left Hand Ditch Co., 6 Colo. 443, 447; Platte Water

Co. v. Northern Colo. Irrigation Co., 12 Colo. 525, 531 [21 Pac. 711]; Crippen v. White, 28 Colo. 298 [64 Pac. 184]. In so choosing between these two inconsistent doctrines Colorado acted within the limits of her authority, first as a territory and then as a state, and her choice was recognized and sanctioned by congress, so far as the public lands of the United States were concerned."

And again:

"It needs only to be added that, by the settled rule of decision in the Supreme Court of the United States, conveyances by the United States of public lands on non-navigable streams and lakes, when it is not provided otherwise, are to be construed and have effect according to the law of the state in which the lands are situate, in so far as the rights and incidents of riparian proprietorship are concerned. Hardin v. Jordan, 140 U. S. 370, 384, 402 [11 Sup. Ct. 808, 838, 35 L. Ed. 428]; Hardin v. Shedd, 190 U. S. 508, 519 [23 Sup. Ct. 685, 47 L. Ed. 1156]; Whitaker v. McBride, 197 U. S. 510 [25 Sup. Ct. 530, 49 L. Ed. 857]; Harrison v. Fite, 78 C. C. A. 447, 449, 148 Fed. 781, 783. Here it is not provided otherwise, either by statute or by the patent, and, as has been seen, the local law does not recognize a conveyance of the land as carrying any right to the unappropriated waters of the stream."

It is therefore believed that the patent from the government did not pass, and the patentee did not take, riparian rights to the waters in question, but that said lands are held by the complainants subject to the law of appropriation of waters as established in this state. And inasmuch as there is no testimony showing any right to the waters of Cascade Creek in the complainant Bigger, other than that of a riparian owner, the finding of the Court must be against him and his case dismissed, if the alleged threatened acts would constitute a valid appropriation.

2. If the defendant were permitted to impound and pipe the waters of Cascade Creek for the purpose of generating electricity to be sold by it as a commodity, as charged in the bill it was threatening to do and admitted in the answer and shown by the proof it intended to do, such acts would have constituted a valid appropriation of said waters under the constitution and laws of the state of Colorado, as they have been construed by the court of last resort in this state. Lamborn v. Bell, 18 Colo. 346, 32 Pac. 989, 20 L. R. A. 241; Sternberger v. Seaton M. Co., 45 Colo. 401, 102 Pac. 168. See, also, Schwab v. Beam (C. C.) 86 Fed. 41, 43.

3. Does the testimony show an appropriation of the waters of Cascade Creek by the complainant company or its predecessors in title, along the falls as they flow through Cascade Cañon?

The people of Colorado dedicated to the public all unappropriated waters of every natural stream within its borders, and made them subject to appropriation as private property. Const. of Colo. art. 16, §§ 5 and 6.

Section 6 reads, in part, as follows:

"The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied."

But neither the manner of making such appropriation nor the acts necessary to be done to constitute an appropriation has been definitely fixed by the constitution, by the statutes or by the decisions of the courts. Nor has the term "beneficial uses," as used in section 6, su-

pra, been definitely fixed and limited in its meaning. I cannot better express my own views as to the meaning of that phrase, applicable to the facts here, than to quote a part of the brief of the learned solicitor for complainant:

"The courts have not defined, because they as yet are unable to define, the exact boundaries of the territory known as 'beneficial use.'

"Mr. Kinney, in his work on Irrigation, says:

" 'The purpose contemplated for the use of the water may be irrigation for agricultural or horticultural purposes, mining, milling, manufacturing, domestic or any other purpose for which water is needed to supply the natural and artificial wants of man provided it be for a beneficial use' (Section 150).

"Pomeroy says (section 47):

" 'The purpose may be mining, milling, manufacturing, irrigating, agricultural, horticultural, domestic or otherwise; but there must be some actual, positive, beneficial purpose, existing at the time, or contemplated in the future, as the subject for which the water is to be utilized.'

"The public health is a beneficial use, and for that purpose, among others, a city may condemn streams of water. The water, when so obtained, may be used and is used in any manner that will promote the public health; it is used for sprinkling the streets, washing the pavements and flushing the sewers.

"Rest and recreation is a beneficial use, and for that purpose water is used to make beautiful lawns, shady avenues, attractive homes, and public parks with fountains, lakelets and streams, and artificial scenic beauty.

"Cities condemn water, and use water for the foregoing purposes. No one questions but that public health, rest and recreation is a domestic use, as well as a beneficial use. No one, we may add, questions the right to these uses.

"The law inside of a city is not different from the law outside of the city. In one sense there is no commercial value to fountains and parks; they do not bring in a revenue, but they are vastly beneficial to the public health, rest and recreation, and such fact is recognized the world over, and there can be no question but that water, applied to their maintenance and creation is a 'beneficial use.'

"We say that the creation of a summer resort is a beneficial use. Is it no benefit to the public to spend money in making a beautiful place in nature visible and enjoyable? Is it not in line with public health, rest and recreation? If a person takes a stream and, after putting in water-falls, ponds, bridges, walls, shrubbery and blue-grass sod, works it into a beautiful home, that is a beneficial use. It is a benefit to the weary, ailing and feeble that they can have the wild beauties of nature placed at their convenient disposal. Is a piece of canvas valuable only for a tent-fly but worthless as a painting? Is a block of stone beneficially used when put into the walls of a dam, and not beneficially used when carved into a piece of statuary? Is the test dollars, or has beauty of scenery, rest, recreation, health, enjoyment something to do with it? Is there no beneficial use except that which is purely commercial?

"It would seem that parks and playgrounds and blue grass are benefits and their uses beneficial although there is no profit derived from them; if not, then the contention of the defendant corporation must be maintained that nothing but money-making schemes are beneficial. The world delights in scenic beauty, but must scenic beauty disappear because it has no appraised cash value? If this defendant corporation takes the water out of Cascade Cañon, it can take the water out of the Seven Falls and Cheyenne Cañon, and Glen Eyrie, and the beautiful parks, and homes and summer resorts of the state. We feel compelled to say that there are other beneficial uses of the fall of water than the mere production of commodities in competition with others now existing. When the defendant company says the complainants are putting the fall of the water to no beneficial use, it means that the complainants are not ruining the beautiful scenery for cash."

It is therefore held that the maintenance of the vegetation in Cascade Cañon, for the purposes to which it has been devoted by the com-

plainant, by the flow and seepage, and mist and spray of the stream and its falls as it passes through the cañon, is a beneficial use of such waters within the meaning of said section 6, art. 16 of the Constitution, that the complainant intended to use the waters of Cascade Creek for that purpose, and has so used them for many years and thereby appropriated the same. The complainant is not required to construct ditches or artificial ways through which the water might be taken from the stream, in order that it might appropriate the same. The only indispensable requirements are that the appropriator, in order to constitute a valid appropriation, first, must intend to use the waters for a beneficial use, and second, actually apply them to a beneficial use. There is express statutory recognition of utilization of lands from natural over-flow as one means of appropriation, as in the flooding of meadows by natural over-flow without the use of any artificial means whatever. Rev. St. Colo. 1908, § 3165; Humphreys Co. v. Frank, 46 Colo. 524, 105 Pac. 1093; Broad Run Inv. Co. v. Deuel & Snyder Imp. Co. (Colo.) 108 Pac. 755.

The supreme court of this state, in considering the means necessary to constitute appropriation, in Thomas v. Guiraud, 6 Colo. 530, 533, said:

"We do not agree with counsel for plaintiff in error in their position, as we understand it, that the appropriation of water by Guiraud in 1862 was not valid or permanent because he constructed no ditches. Some of the witnesses testify that he did construct ditches, but it is unnecessary for us to weigh the testimony and determine the preponderance thereof upon this question. If a dam or contrivance of any kind will suffice to turn water from the stream and moisten the land sought to be cultivated, it is sufficient, though no ditch is needed or constructed. Or if land be rendered productive by the natural overflow of the water thereon, without the aid of any appliances whatever, the cultivation of such land by means of the water so naturally moistening the same is a sufficient appropriation of such water, or so much thereof as is reasonably necessary for such use. The true test of appropriation of water is the successful application thereof to the beneficial use designed; and the method of diverting or carrying the same, or making such application, is immaterial."

And again, considering the same question, that court, in Larimer Co. R. Co. v. People ex rel., 8 Colo. 614, 616, 9 Pac. 794, 795, declares:

"It is claimed that when the constitution recognizes the right to appropriate water by diversion, it excludes the appropriation thereof in any other manner. Further, that the word 'divert' means to take or carry it away from the bed or channel of the stream; that therefore respondent's act of utilizing a natural reservoir in the bed of the stream, and thus storing surplus water for future use, not being a diversion in the sense of the constitutional provision cited, is in conflict therewith. We are not prepared to concede the correctness of counsel's position. It is our opinion that the above is not the most natural and reasonable view to adopt concerning the meaning of the constitution. The word 'divert' must be interpreted in connection with the word 'appropriation,' and with other language used in the remaining sections of that instrument referring to the subject of irrigation. We think there may be a constitutional appropriation of water without its being at the instant taken from the bed of the stream. This court has held that 'the true test of the appropriation of water is the successful application thereof to the beneficial use designed, and the method of diverting or carrying the same, or making such application, is immaterial.' Thomas v. Guiraud, 6 Colo. 530."

See, also, Ft. Morgan L. & C. Co. v. South Platte Ditch Co., 18 Colo. 1, 5, 30 Pac. 1032, 36 Am. St. Rep. 259.

In Offield v. Ish, 21 Wash. 277, 57 Pac. 809, it is said:

"The right to use the water is the essence of appropriation. The means by which it is done are incidental."

See, also, McCall v. Porter, 42 Or. 49, 70 Pac. 820, 822.

It therefore appears that the waters of Cascade Creek, which the defendant threatens to impound and carry away in pipes, has already been appropriated by the complainant, the Cascade Town Company, for beneficial uses and that it has a vested property right therein which the defendant's contemplated acts, if executed, will destroy. The complainant company may have a decree as prayed, with costs. The bill of complainant Bigger will be dismissed, with costs to the defendant against him.