UNITED STATES of America,
Plaintiff,

v.

H. F. BALLARD, M. M. Bradley, George
C. Brumble, Leroy Caffall, Arthur J.
Mayes, John Mayes, A. M. Leeman,
George Smart, Vera Lamb, Vola Ryan
and Gene Hood, Defendants.

State Game Commission of the State of
New Mexico, Intervenor.

Civ. No. 4194.

United States District Court
D. New Mexico.

June 14, 1960.

James A. Borland, U. S. Atty., by Ruth C. Streeter, Asst. U. S. Atty., Albuquerque, N. M., Perry W. Morton, Asst. Atty. Gen., Alfred H. O. Boudreau, Jr., David R. Warner, Dept. of Justice, Washington, D. C., by Warren R. Wise, Washington, D. C., for plaintiff.

Neal, Neumann & Neal, by Caswell S. Neal, Carlsbad, N. M., for defendants.

Hilton A. Dickason, Jr., Atty. Gen., Thomas O. Olson, Lyle E. Teutsch, Jr., Asst. Atty. Gen., by Lyle E. Teutsch, Jr., Santa Fe, N. M., for Intervenor.

ROGERS, District Judge.

This is a Water Law case, involving lands in Southeastern New Mexico, in Eddy County, wherein the United States of America brings this Action in behalf of Carlsbad Caverns National Park against some nine individual private owners of land in that section of the country. The State Game Commission of the State of New Mexico has intervened herein, to establish a water right to use .44 cubic feet per second of the flow of Rattlesnake Spring, claiming that the water right was acquired by appropriation in 1880, together with further right to use .29 cubic feet per second of the flow from said Springs by license granted by the State Engineer of the State of New Mexico in 1935. The date of the appropriation which was eventually purchased by the United States of America, likewise bears date of 1880.

The United States of America demands injunctive relief in this cause against each of the private land owners, defendants herein, by way of Injunction enjoining the defendants from so using the latter's wells as to deprive the United States of the use of the flow of Rattlesnake Spring, to which it is entitled. It asks additional relief by demanding that the Court appoint a Special Water Master to police defendants' use of water in accordance with the Judgment of the Court, and such other and further relief as may be proper.

Each of the defendants have filed practically identical Answers which deny the allegations of the Government's Complaint, and raise the defense of Non-User under the Four Year Statute of New Mexico (Sec. 75-5-26, N.M.S.A. 1953), raising the defense of waste, as against the Government, the equitable doctrine of Unclean Hands, and the affirmative defense that the Government, by drilling shallow wells, will thereby secure sufficient flow of water from Rattlesnake Spring to enable the Park Service to have full use of its 105 acre foot per year water right. There is interwoven among these defenses, those of hardship and balancing of equities.

In order to understand the complex issues of this cause, it is necessary to recite, at length, the factual situation. The Court trusts that this will not be inordinately long, but in any event, it feels that such recitation is necessary.

The facts, as ultimately found by the Court in this case, are as follows:

Plaintiff United States of America operates Carlsbad Caverns National Park, through the National Park Service of the Department of Interior. The Park was established by Congressional Action. It now contains approximately forty-five thousand acres of land, and its chief attraction is Carlsbad Caverns, one of the largest and most spectacular caverns in the world. Annual attendance records, except during the War years and the attendance growth of the Park is disclosed by plaintiff's exhibit "B", and now is almost one-half million persons per year. Water is, of course, necessary for the use of visitors, Park personnel, food concessions, and others.

The present water supply at the Park is furnished from Rattlesnake Spring, and is pumped from the Spring through a pipeline about five and one-half miles to storage, for use at the Park.

Defendants and each of them are farmers, and irrigate their farms by means of underground water wells, all of which

were drilled prior to the inclusion of their farms in an extension of Carlsbad Underground Water Basin by the State Engineer of New Mexico, which extension was made October 21, 1952. Since that date, permits to drill additional underground water wells must be obtained from the State Engineer under applicable underground water laws and regulations. No new wells have been drilled in the Basin, and the Carlsbad Basin has been closed for future development, except for permits issued to drill underground wells to supplement surface water rights.

Intervenor State Game Commission of New Mexico, an agency of the State created by the Legislature, owns and operates a game farm adjacent to Rattlesnake Spring. Black River flows through the lands of the Game Commission. The Commission claims the right to appropriate waters of both Black River and Rattlesnake Spring. Lands in the vicinity of Rattlesnake Spring and the State Game Farm have been irrigated from time to time, by the waters of Rattlesnake Spring and Black River for many years. However, no persons claiming any rights to the flow of Rattlesnake Spring or Black River, other than the State Game Commission of New Mexico, and the United States, are before the Court.

The geology of the area and a general description of the underground Basin and waters in the vicinity of Rattlesnake Spring are fully and completely contained in Defendants' exhibit "3" which was written by W. E. Hale of the United States Geological Survey, in cooperation with the New Mexico State Engineer. The report is published as Technical Report No. 3 by the State Engineer, and was prepared in cooperation with the Geological Survey and National Park Service. The investigation began in 1952. The report was published in 1955, and investigation of the area is still in progress. The report principally discusses the relation of ground water to Rattlesnake Spring, and the effect of pumping from wells in the area on the flow of Rattlesnake Spring (Exhibit 3, page 4, Report).

On June 22, 1921, Henry Harrison filed with the State Engineer, a declaration of water right (Plaintiff's exhibit "C") claiming the right to appropriate 5.35 second feet of water from Rattlesnake Spring for the purpose of irrigating 65.71 acres of land with a priority of 1880. The lawful duty of water at all times material hereto, was one cubic foot of water to 70 acres of land (N.M.S.A. 1953, Sec. 75-5-17). The Harrison right, No. 0432 was limited to the extent it had been placed to beneficial use, namely 65.71 acres. In 1934 (Plaintiff's Exhibit "D"), the United States acquired a Deed from the heirs of Henry Harrison to 79.87 acres of land, with 35 acres of water rights from Rattlesnake Spring. The Government owns under this conveyance, 105 acre feet of water per annum, such claim being based upon a duty of 3 acre feet per annum on the 35 acres purchased, with a priority of 1880, together with the right to one-half second feet of water from what is known as Rattlesnake Spring. Transfer of the right to one-half second feet of water from what is known as Rattlesnake Spring from Ida May Harrison, widow of Henry Harrison, to the United States was filed in the Office of the New Mexico State Engineer on October 16, 1936. All the parties to this proceeding agree that at all times prior to the conveyance to the United States of the right to use one-half c. f. s. of the flow of Rattlesnake Spring, Henry Harrison, and his wife Ida May, had a right to use .5 c. f. s. of the flow of Rattlesnake Spring, with a priority of 1880.

The remainder of the Henry Harrison irrigated lands not purchased by the United States, was later acquired by purchase by the State Game Commission (30.71 acres) which also acquired by purchase the Ida May Harrison right, No. 2096, to irrigate 20.4 acres of land from Rattlesnake Spring. The Game Commission claims the right to irrigate from the Springs, 30.71 acres of land from the

Henry Harrison right, and 20.4 acres from the Ida May Harrison right, No. 2096, a total of 51.11 acres.

After the purchase of the 35 acres of land from the Harrison right, No. 0432, the United States applied to the State Engineer for a permit to change the place and method of use of 14 acres of right to Carlsbad Caverns for domestic and industrial use. The Court finds this 14 acres of water right transferred to the Caverns was the equivalent of 2/10 second foot to be used to the extent of 42 acre feet at the Caverns. The remaining 3/10ths second foot was declared applicable to the remaining 21 acres of land (63 acre feet) to be irrigated by the Park Service. This application was approved by the State Engineer March 1, 1937 (Plaintiff's Exhibit "E") and a license issued. In the rider attached to Proof of Works under application of water to beneficial use, it was represented to the State Engineer that 94 acre feet had been used at the Caverns in 1936; that a total of 144 acre feet would be needed for the Caverns in the near future; that the remaining 21 acres of irrigated land at 3 acre feet per annum had actually been applied to the irrigated land. Measurements kept by the Park Service between February 1958, and December 1959, show an actual use of the 22.771 acre feet at the Caverns in 1959, and approximately 21 acre feet in 1928 (Defendants' Exhibit "2"). It has not been shown by any evidence in the case that the Park Service applied 3 acre feet to the irrigation of 21 acres of land.

A similar permit to that issued by the Engineer on March 1, 1937, was issued to the Park Service on December 27, 1937.

Under date of December 20, 1942, the Park Service again applied to the State Engineer for a permit to change the place and purpose of use of the 21 acres of water right owned by it after the transfer of 14 acres to the Caverns, to 0.02 c. f. s. for the use of a CCC Camp, and the remaining 0.28 c. f. s. be applied to other lands. It requested that the use of 3 acre feet per annum for irrigation of the 21 acres, be applied at 2.06 acre feet per annum to 28.55 acres of land. This permit was granted (Plaintiff's Exhibit "F") August 21, 1943, at which time the entire 35 acres of water right purchased by the Government, became licensed as follows:

.2 cfs for Cavern use (42 acre feet per year) being 14 acres x 3 a. f. duty of water.

.02 cfs transferred to CCC Camp.

.28 cfs transferred from 21 acres at 3 acre feet per anum to 28.55 acres at 2.06 acre feet per annum (63 acre feet per annum).

.5 cfs total to be used to extent of 105 acre feet.

The Court finds that the first pump installed at the Springs to pump water to the Cavern area had a rated capacity of 60 gallons per minute, which would produce only .13 second feet of water.

In November 1957, a new pump was installed, set to discharge 80 gallons per minute. It remained at that setting until June 1958, when it was reduced to 59 gallons per minute. In the Fall of 1958, it was re-set at 80 gallons per minute and remained at that setting until January 1959, at which time it was re-set at 90 gallons per minute, and has remained at that setting since that time. It is disclosed by the evidence (Plaintiff's Exhibit "K"), that the peak demand at the Caverns for water use occurs around July 4 or Labor Day. In 1959, the peak demand reached on July 4th, when 5432 persons visited the Caverns, was 88.30 gallons per minute, or less than the 90 gallons per minute at which the present pump is set, and was set during all of 1959. The former pump is now held as a standby pump.

The average daily attendance in July and August 1959, was 3343 visitors. Peak attendance day in July 1959, was 1.62 times greater than the average attendance. The Court finds that the National Park Service pump is cut on and

off by radio beams directed from the equipment installed at the 500,000 gallon steel tank in the Cavern area. When this 500,000 gallon tank reaches a reading of 450,000, a radio beam is sent to the pump to start it. When the tank fills, a radio beam turns the pump off. The Park Service paid approximately $158,000 for the tank and pipe.

The Court finds that there has never been a time since the 500,000 gallon tank was installed in 1957, when it did not contain a reserve of approximately 450,000 gallons.

The Court finds that in addition to the 500,000 gallon tank at the Caverns, there is a concrete tank with a capacity of 70,000 gallons, which was used prior to the installation of the steel tank. This storage capacity has not been used by the Caverns since 1957.

Prior to the purchase of water from Rattlesnake Spring, the Spring was held back by an earthen dam and water flowed from the east gate toward Black River. The Springs was clear, and contained a light sandy bottom, where one could see numerous springs bubbling up. As many as sixteen springs were observed. The Park Service entered the Springs area and built a rock, brick and cement wall around some of the springs. Inside this area they built a sump over what appeared to be the largest spring, and water is pumped from inside the sump to the Caverns. In building the enclosure around the spring area, the Park Service did not take in a part of the Spring area to the west, and a part of it to the south, and these springs are now producing water which creates marshes and waste, and which cannot be, and has not been applied to any beneficial use.

The enclosure by the Park Service of a part of the Springs, and elevating the water may have reduced the historic flow of the Springs.

In 1923, the Springs had a flow of 4.72 c. f. s. taken by Willis T. Lee of the United States Geological Survey. In 1908, two measurements were taken by the Hydrographic Survey, being 4.23 c. f. s. and 5.35 c. f. s.

In 1943 a flow of 7 c. f. s. was measured by Diehl of the Park Service.

In 1921 Harrison claimed the Springs had a flow of 5.35 c. f. s.

Since the Park Service development of the Springs, no record of the Springs' discharge was kept prior to early 1952. During the period covered by the Hale report (Defendants' Exhibit "3"), the discharge ranged between 1.7 and 4.2 c. f. s. Monthly spot checks were made by the United States Geological Survey from May 15th, 1952 through April 13, 1960 (Plaintiff's Exhibit "BB"). Throughout all this period, on occasion, the Springs were not measured because they were overflowing. A period of low flow appears beginning August 6, 1958, when the flow of the Springs was .03, but the pump was also pumping to the Caverns at the time this measurement was taken. This is also true of the flow of .13 on August 19, 1958, taken with the Caverns' pump running. It appears from this chart of the U.S.G.S., that there was only one measurement taken during the approximate eight year period, when a measurement was taken with the pumps not running, when the Springs were not producing the claimed .196 c. f. s. required for peak production. This apparently was on August 28, 1958. During that month, the Park Service pumped 862,690 gallons (Defendants' Exhibit "2"). There is no evidence in the record to indicate that at period of low flow, the 500,000 gallon tank, with its reserve of 450,000, was not adequate to supply all Cavern needs for a substantial period of time.

The Court finds that the years 1951 through 1959, except for one year, were years of much lower than average rainfall. The average rainfall at the Caverns over a period of the last twenty-four years, has been 15.35 inches. The average rainfall at Carlsbad over the last fifty-nine years has been 13.25 inches. (Defendants' Exhibit "3", page 12). The record of the annual rainfall at these

two stations (Defendants' Exhibit "25") discloses an area of extreme drought, and in some years less than 50 per cent of the normal rainfall was received. The Court finds that drought caused a decline in the Springs' flow of about 0.5 c. f. s. in the period between March 1953 and March 1954 (Defendants' Exhibit "3", page 34). The extension of the drought period to include 1959, has caused considerable additional loss, due to insufficient recharge in the Basin.

The Court finds that there are four outlets from Rattlesnake Spring, namely: Flume No. 1 (North Ditch), Flume No. 2 (Park Service Ditch), Flume No. 3 (Waste Ditch to duck ponds), and Flume No. 4 (Game Commission Ditch). Accurate daily records of Spring flow were kept by the National Park Service on the discharge from these ditches for the period May 29, 1959 to April 18, 1960 (Plaintiff's Exhibit "L"). These records, converted into acre feet as shown by the Summary compiled by Mr. Arthur F. Brown (Defendants' Exhibit "35"), discloses the following facts:

During this period, the Springs produced, exclusive of pumping to the Caverns, 1234 acre feet of water. The North Ditch, except for irrigation of a part of the yards of Park Service attendants, was used by the Game Commission for irrigation. The total rights claimed by the Game Commission for irrigation from Rattlesnake Spring, including the duck ponds, is 30.71 acres under 0432, and 20.4 acres under 0296, or a total of 51.11 acres, at a duty of three acre feet per annum, or a total of 153.33 acre feet of water. The actual measurement shows 914 acre feet through the north ditch; 24 acre feet through the south ditch, and 165 acre feet to the duck ponds.

The total irrigation right claimed by the Park Service is 63 acre feet per annum.

The following reflects the finding of the Court as to the amount used at the Caverns, as compared to the flow of the Springs, in acre feet:

| 1959 | Springs Produced | Park Used |
|---|---|---|
| June | 77.3 | 3.3 |
| July | 87.7 | 2.7 |
| August | 55.4 | 3.4 |
| Sept. | 51.7 | 1.7 |
| Oct. | 132.2 | 2.2 |
| Nov. | 159.6 | 1.6 |
| Dec. | 158.5 | 1.5 |
| 1960 | | |
| Jan. | 147.5 | 1.5 |
| Feb. | 152.5 | 1.5 |
| Mar. | 145.7 | 0.7 |

In 1959, the amount used at the Caverns was 22.8 acre feet, and for the eleven months for which figures are available, the Caverns used 21.1 acre feet in 1958.

The Court finds, on the basis of the actual records of measurements made by the Park Service alone, that the flume No. 2 of the Park Service used an amount of water equal to approximately six years of Cavern requirements based on 1959 figures; that the waste ditch (Flume No. 3) at the Springs, during the period of measurement, used an amount of water equal to approximately seven and a half years of Cavern requirements; that the south ditch of the Game Commission (Flume No. 4) used a year's supply at the Caverns, although it is claimed not to have been used, and that the north ditch (Flume No. 1), used an amount of water equal to approximately thirty-nine years of Cavern requirements.

The Court finds, relative to the Intervenor State Game Commission, that about 1948 it purchased the Ida M. Harrison permit to irrigate 20.4 acres of land from the south ditch (Flume No. 4), and claims by purchase, 30.71 acres originally watered by both the north ditch (Flume No. 1), and the south ditch (Flume No. 2). After the sale of the 35 acres of land to the Park Service there was no means of irrigating any of the land in the two Harrison rights from the north ditch. The two Harrison rights covered in substance the lands described in Intervenor's Exhibit "J", as Marsh No. 1, Marsh No. 2, and Tracts 10, 11, 12, 13 and 14. Tract

No. 13 containing 8.631 acres has not been irrigated in the years 1954 to 1959, inclusive. The Game Commission has, since 1954, irrigated lands described in Tracts 15, 16, 18, 19, 20, 21, 25 and in 1956, Tract 24 from the North Ditch (Flume No. 1) of Rattlesnake Spring, without any permit or authority to water these tracts from waters of Rattlesnake Spring. Its two farm supervisors, since the purchase of the Washington Ranch area have not been advised as to what lands the Game Commission has a right to use water on, either from Rattlesnake Spring or Black River. They have used Springs water to irrigate Black River lands. They have used Black River water to irrigate Rattlesnake Spring lands. They have co-mingled waters for irrigation from Black River and Rattlesnake Spring. They have utilized water from Rattlesnake Spring from a two inch pipeline, starting in the pump sump of the Park Service, for use at the Game Commission Headquarters, without any permit to use the same. They have alternately irrigated lands in season and used water to fill the duck ponds maintained by them in winter. In 1959 they filed application with the State Engineer to abandon duck ponds No. 1 and No. 2, and to transfer their water rights from present locations to the tracts north of Tract 15. This application is now pending before the State Engineer of New Mexico, and the applications, maps and other facts relative to the "Change of Place of Use" are fully set forth in Game Commission's Exhibit "H", of February 1959, and consists of four sheets of maps. The Court finds that continuously since 1954, the Game Commission has overplanted the approximate 51.3 acres claimed by it. In 1954, it irrigated 92.796 acres; in 1955, 78.605 acres; in 1956, 82.269 acres; in 1957, 101.57 acres; in 1958, 94.44 acres, and in 1959, 54.752 acres.

Originally, the Game Commission, in about 1951, maintained three duck ponds. It was determined as early as 1952, that they would not hold water, and pond No. 3 was abandoned and placed in cultivation in 1952 or 1953. The Commission was unable to maintain water in the other ponds, due to the character of the land upon which the ponds were located. In 1952, it purchased oil field clay and aquijel and attempted to seal the bottom of the ponds, but was unable to make the ponds hold water. The water would seep beneath the surface, and was subject to evaporation. The ponds would dry up in the summer months. The Court finds that this use of water was wasteful, and that this fact has been known by the Game Commission and Park Service since 1952. Parts of these ponds and dams were located on Park Service lands leased by "Special Use Permit" by the Park Service to the Game Commission (Defendants' Exhibit 5). The waste water from Flume No. 3 was permitted by the Park Service to continuously flow into these ponds the year around, and in the period from May 29, 1959, to April 18, 1960, according to Park Service measurements (Defendants' Exhibit 35), 165 acre feet of water was delivered through the waste ditch to the duck pond lands.

With reference to the Park Service ditch (Flume No. 2), from the time the Park Service purchased the land until 1953, this ditch extended only to a point just south of the corral shown on a map (Defendants' Exhibit 1), and prior to 1953, no water could be delivered to any Park Service lands except tracts A and B shown on this exhibit. At all times since the Park took over, a part of the water for Tracts A and B was obtained from Flume No. 1. The Court finds that water from Rattlesnake Spring has been, at all times, beneficially used on Tracts A and B.

In 1953, the Park Service ditch was extended by blading a ditch approximately one foot in depth, along the north line of Tracts C and D on this map. No Park Service lands east of Tract D have ever been irrigated by the Service, although in 1960 a part of this land has been cleared for irrigation, purportedly to provide food for three horses owned by the Park Service.

Prior to 1953, Tract C was not irrigated by the Park Service, and in 1957 or 1958, about four to five acres in Tract C was placed in alfalfa. The Tract was not irrigated by the Park Service from the date of its acquisition in 1953, a period of about nineteen years.

Prior to the establishment of a CCC Camp on Tract D, no water had been applied to that Tract. Water was obtained from Flume No. 1 to maintain a swimming pool at the CCC Camp. The Camp was abandoned in 1944. From 1944 to 1953, when Flume No. 2 was built along the North edge of Tract D, no water was applied to the tract from Rattlesnake Spring. This ditch in the former CCC area is at present grown up with weeds, and is only a few inches deep, and is not capable of carrying water to irrigate the Tract D lands.

Defendant Arthur J. Mayes is the owner of Water Right No. C–391 to irrigate 22.9 acres of land with a duty of three acre feet per year, serviced by U.S.G.S. Well No. 341, located in the Southwest Quarter of Sec. 3, Township 26 South, Range 24 East (Defendants' Exhibit "9").

Defendant is the owner of Water Right C–390 for the irrigation of 17.8 crop acres at three acre feet per annum, and 9.4 grass land acreage at 1½ acre feet per annum. It is serviced by U.S.G.S. Well No. 131, located in the Northwest Quarter of Sec. 10, Township 26 South, Range 24 East (Defendants' Exhibit "8").

In improving C–391, Defendant has spent $3,141.10, and in improving C–390, has spent the sum of $5,004.81. $990.50 of this amount was spent for concrete ditches to save water losses, for which purpose the United States contributed one-half the costs. There has been no addition by way of putting in new lands to these permits. The wells of Arthur J. Mayes are highly sulphate in content, and the water from the wells does not contribute to the flow of Rattlesnake Spring (Hale, U.S.G.S.; Brown).

Defendant John Mayes is the owner of Water Right C–413 (Defendants' Exhibit "12") for the irrigation of 29.1 crop acres at three acre feet per annum. This land is irrigated from Well No. 441, located in the Southeast Quarter of Sec. 9, Township 26 South, Range 24 East.

In the development of this farm, Defendant John Mayes has expended $8,230. There has been no increase in the original declared acreage.

This well water is of high sulphate content, and is aproximately four miles from Rattlesnake Spring. Its source of water does not contribute to the flow of Rattlesnake Spring. (Hale, U.S.G.S.; Brown).

Defendant A. M. Leeman filed Declarations C–409 (Defendants' Exhibit "15") and C–408 (Defendants' Exhibit "16") for the purpose of irrigating lands located in Sec. 10, Township 26 South, Range 24 East, being U.S.G.S. Wells Nos. 321 and 341.

The total expenditure of A. M. Leeman, in developing these lands, was $31,068.97. In addition to this, the Government paid $3,300 toward one-half the cost of lining the ditches.

Defendant Gene Hood has contracted to purchase 80 acres with water rights, from A. M. Leeman, for $32,000 ($400 per acre) upon which Hood has paid $5,645.85, and has expended an additional $2,875 for farm equipment. The contracts, deeds and assignment of water rights are in escrow in a Carlsbad Bank. Mr. Leeman reserved the grass irrigation rights. There has been no increased acreage above that originally irrigated.

This well water is of high sulphate content, and its source does not contribute to the flow of Rattlesnake Spring. (Hale, U.S.G.S.; Brown).

With reference to Defendants M. M. Bradley, Vera Lamb and Vola Ryan:

A declaration of water right was filed by M. M. Bradley on lands owned by Ivan Thurman, now deceased, being No. C–491, for the irrigation of 770 acres of land described therein. (Defendants' Exhibit "20") The land was to be serviced from Well 111 located in the Northwest Quarter of Sec. 9, Township 26

South, Range 24 East. The State Engineer, as Plaintiff, in Cause No. 13791 in the District Court of Eddy County, with Ivan Thurman and M. M. Bradley as defendants, sought to enjoin development under the Declaration. The Judgment of the Court declined the Injunction. (Defendants' Exhibit 20). No additional development was made due to the death of Ivan Thurman. The water right is limited to the irrigation of 64 acres at three acre feet per year. The land and water rights are now owned by Vera Lamb and Vola Ryan, daughters and heirs of Ivan Thurman, deceased.

This water well is of high sulphate content and its source does not contribute to the flow of Rattlesnake Spring. (Hale, U.S.G.S.; Brown).

Defendant George Smart homesteaded 160 acres of land in the Northwest Quarter of Sec. 27, Township 25 South, Range 24 East. He intended to place 120 acres in irrigation.

He drilled two wells on the land in 1951, being U.S.G.S. Nos. 132 and 141 in Sec. 27. He was enjoined by the State Engineer from irrigating crops from the wells, and an appeal is now pending from the Engineer's decision to the District Court for Eddy County.

His homestead entry was canceled for his failure to seasonably apply waters to the land. He has applied to have the homestead reinstated.

He has never planted or irrigated any crops, except a few fruit trees which are irrigated from domestic well U.S.G.S. 141. No irrigation or water use has been made of Well No. 132. Its waters are of lower level than adjacent water levels to the east. The water from irrigation well 132 passes to the Northwest of Rattlesnake Spring, and does not contribute to the Springs' flow. (Defendants' Exhibit 3. Hale Report: Pages 33 and 19; Brown).

With reference to Defendants George C. Brumble and Leroy Caffall:

W. E. Hellyer and Bob McClure filed water rights C–425, C–426 and C–510 with the State Engineer. (Defendants' Exhibit 34). Amended Declarations to C–425 and C–426 were filed (Defendants' Exhibit "34"). Well C–510 is a domestic well which covers only one acre of land for domestic use. The combined Declarations covered 245.6 acres of irrigated land at three acre feet per annum, and 185 acres of grass land at 1½ acre foot. The Engineer's survey in 1958 disclosed 267.6 acres in crop lands, and 163.5 acres of natural grass irrigated at 1½ acre feet per annum. By drying up grass lands approximately 300 acres are in crop irrigation.

The lands with water rights owned by Hellyer and McClure were purchased about 1955 by Defendants Brumble and Caffall, who have farmed it, since.

Defendants Brumble and Caffall agreed to pay a total of $109,000 for the lands and water rights. Of this sum, they have paid $40,000 and now owe $69,000. They have expended an additional $50,000 in improvements.

The Court finds that Brumble and Caffall have made no excess use of water for irrigation of their lands.

The Court finds that pumping of irrigation water from Wells Nos. 124 and 421 belonging to Brumble and Caffall does have an effect upon the flow of Rattlesnake Spring, and that the aquifer from which they pump, also contributes water to the flow of Rattlesnake Spring.

Defendant H. F. Ballard has Declaration C–388 (Defendants' Exhibit "21") for the irrigation of 150.3 acres of land at three acre feet per annum, in Sec. 34, Township 25 South, Range 24 East.

Defendant also has Declaration C–389 (Defendants' Exhibit 21) for the irrigation of 87 acres of land at three acre feet per annum, in Sec. 37, Township 25 South, Range 24 East.

Defendant has gradually increased his acreage as he was able, with diligence, to put his Declared acreage into irrigation. In 1958 he planted 185 acres of crops, which is the most he has applied to beneficial use. He does not intend to increase his acreage over 185 acres. Because of

the pendency of this action, he did not plant his grain crops in 1958, nor has he planted them since. Each year, however, he has planted cotton, alfalfa and corn.

At the present time he is only using water from Well 112A, and Well 124 on a stand-by basis.

The Court finds that the pumping of the Ballard wells has very little appreciable effect on the flow of Rattlesnake Spring. (Fields, U.S.G.S.).

The Court further finds that H. F. Ballard has made an investment of approximately $40,991.88 in the development of his farm and in farming equipment. In addition to this, the Government has paid $800, matched by Ballard, for leveling 40 acres of his irrigated lands.

The Court finds from all the evidence in the case, including the Spring flow taken from U.S.G.S. records from 1952, the following: The actual Springs flow shown by the measurements kept by the Park Service; the actual Park use, which has not exceeded approximately 23 acre feet per annum; the Park use as compared to the Springs' flow as recorded since May 1959; the storage facilities at the Park, which have at all times since 1957, contained approximately 450,000 gallons; that plaintiff has not suffered irreparable injury and damage as alleged in the Complaint.

The Court finds that since 1955, the U.S.G.S. suggested that by drilling a well in the Springs area, adequate water could be obtained for National Park uses, even in the event the Springs should dry. This is contained in Technical Report No. 3 (Defendants' Exhibit "1"), prepared by the U.S.G.S. in cooperation with the State Engineer, and was prepared "In cooperation with the National Park Service". The Court finds such a well, if drilled, could provide adequate water for Park use, and be used by the Park Service merely as a stand-by well to be used in emergency in the event of further extreme drought or further deterioration of the Springs' supply. The Court finds it is the policy of the State Engineer to permit the drilling of wells in the Carlsbad Basin, to supplement surface water rights. The Court finds that apparently no consideration has been given by the Park Service to the suggestion and conclusion reached by the State Engineer and the U.S.G.S. relating to the drilling of such a well. The Court finds that such a well could be drilled and equipped for approximately $4,000.

The Court further finds that the Park Service has a 70,000 gallon concrete tank at the Park Headquarters, formerly used as its main reservoir, which has not been used to store water for several years. Reasonable diligence on the part of the Park Service, when they contemplated a possible shortage of water in peak periods of use, would seem to require the use of all available storage facilities. The United States has never used more than 90 gallons per minute, or .2 cubic feet per second, during the periods of maximum demands for water at the Carlsbad Caverns.

The right of the United States to 105 acre feet per annum, which is .143 cubic feet per second, does not equal the maximum demand of .2 cubic feet per second. However, the annual demand for water at Carlsbad Caverns has never equaled 25 acre feet per annum, and the United States may, by proper use of its present storage facilities and the drilling and equipping of an auxiliary well, adequately meet any foreseeable demands for water.

After allowing a maximum annual demand for water at Carlsbad Caverns of 25 acre feet per annum, the United States still has left 80 acre feet per annum, which is more than adequate to meet the irrigation needs of the Government at Rattlesnake Springs.

The Court is unable to find from all the evidence in the case, that there is not adequate water developed by the Springs to fulfill the requirements of the National Park Service. In the period between May 29, 1959 and April 18, 1960, the Park Service exceeded its total claimed irrigation water right of 62 acre feet per annum, by 68 acre feet. It cannot complain of use by others when it exceeds by

its own measurements, its irrigation water right. In the claimed critical months, it used in July, 8 acre feet for irrigation, and 3.4 acre feet for the Park, and in August, 15 acre feet for irrigation, and 1.7 acre feet at the Park.

Having indulged in the foregoing recitation of the facts applicable hereto, we must now turn to the law as it regards water rights in the western United States, and particularly to the District of New Mexico.

The Doctrine of Appropriation for the use of public waters has its roots in certain of our Western States. Among these are California, Arizona, Colorado, Montana, Nevada, New Mexico, Oklahoma, Oregon, North Dakota, South Dakota, Texas, Utah, Wyoming and Idaho. It is predicated, as is so much of the law, upon necessity. The Riparian Theory of Water Rights does not conform to lands which are arid, and water which is scarce. By local custom, analogy to mining law and eventual acceptance by courts and legislatures, the doctrine of "first come, first served" was applied in granting water rights to persons who diverted public waters and applied the same to a beneficial use.

The late E. L. Moulton, a recognized economist and long-time friend of the writer of this opinion, has told the Court many times, and stated, in writing his highly regarded book "New Mexico's Future; an Economic and Employment Appraisal", that if the most efficient use of the public water of New Mexico were to be had, only a maximum of ten per cent more land in the State could be irrigated for agricultural purposes. Under these conditions, the Doctrine of Appropriation hereinafter discussed in detail, has been accepted in New Mexico. For some background material on this branch of the law, see Wiel "Water Rights of the Western States", Third Edition, Chapter 5.

To better understand the facts hereinbefore set forth, and the law applicable thereto, the following tables are set forth:

1 cfs equals 2 acre feet per day (approx.).
1 cfs equals 448 gallons per minute.
.5 cfs equals 224 gallons per minute.
1 acre equals 43,560 square feet.

Attention must be given to Article XVI of the Constitution of New Mexico, which was effective in the year 1912. Section 1 provides as follows:

"All existing rights to the use of any waters in this state for any useful or beneficial purpose are hereby recognized and confirmed."

Section 2 provides as follows:

"The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right."

Section 3 provides:

"Beneficial use shall be the basis, the measure and the limit of the right to the use of water."

Section 4 provides:

"The legislature is authorized to provide by law for the organization and operation of drainage districts and systems."

Prior to the effective date of the Constitution, certain laws or water rights existed, as will appear from the cases hereinafter set forth. In addition to the case law, the Territorial Legislatures had promulgated a comprehensive Water Code. Attention is particularly pointed to the Session Laws of New Mexico, 1907, which have been steadily augmented with passing sessions of the Territorial and State Legislatures. The comprehensive statutory Water Code now appears in Article 75, N.M.S.A. 1953.

The basic case law on New Mexico Water Law appear in the following leading authorities and cases: Albuquerque Land & Irrigation Company v. Gutierrez, 10 N.M. 177, 237, 61 P. 357; Snow v.

Abalos, 18 N.M. 681, 140 P. 1044; Wiel on Water Rights, Vol. 1, Sec. 118, page 141; Trambley v. Luterman, 6 N.M. 15, 27 P. 312; United States v. Rio Grande, etc., Company, 9 N.M. 292, 51 P. 674; Id., 174 U.S. 690, 706, 19 S.Ct. 770, 43 L.Ed. 1136; Gutierres v. Albuquerque Land & Irrigation Company, 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588; Hagerman Irrigation Co. v. McMurry, 16 N.M. 172, 113 P. 823; Farmers' Development Co., v. Rayado, etc., Co., 28 N.M. 357, 367, 213 P. 202.

The best analysis of this branch of the law that the Court has read, is the lucid and articulate opinion of Circuit Judge Orie L. Phillips, then Judge of this Court, in Murphy v. Kerr, 296 F. 536. The law contained in the above authorities has survived the emasculative effort of the Supreme Court of New Mexico in the case of State ex rel. State Game Commission v. Red River Valley Company, 51 N.M. 207, 182 P.2d 421.

■ The provisions of the New Mexico Constitution, statutory law of New Mexico and the case law of the Federal, Territorial and the State Courts of New Mexico above cited, govern the acquisition of Water Rights of all the parties, including the Government of the United States, the State Game Commission of the State of New Mexico, and the individual defendants joined herein.

■■ As to the Statutory non-user provision of New Mexico (Supra), abandonment and waste by the Federal Park Service, however, the right to use water from Rattlesnake Spring purchased by the United States from Ida May Harrison in 1934, is property of the United States, and as such, is controlled by Congress under Article IV, Sec. III, Clause 2 of the United States Constitution. That the law is as just stated, will appear in the following Decisions: Ivanhoe Irrigation District v. McCracken, 357 U.S. 275, 285, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313; Utah Power & Light Company v. United States, 243 U.S. 389, 399, 404, 37 S.Ct. 387, 61 L.Ed. 791; United States v. State of Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267; Gibson v. Chouteau, 13 Wall. 92, 80 U.S. 92, 20 L.Ed. 534; Jourdan v. Barrett, 41 How. 169, 45 U.S. 169, 11 L.Ed. 924; United States ex rel. Tennessee Valley Authority v. Caylor, D.C., 159 F.Supp. 410. It is held in United States v. State of California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, that property of the United States may not be lost through the laches or neglect of its officers and employees.

■ Defendants, rather obliquely, attempt to discredit the use by the State Game Commission as not being for any useful or beneficial purpose. This Court rejects this attack on the basis that the attainment of the State conservation purposes is such a purpose as to constitute a useful or beneficial application of the waters of New Mexico. If any shoring up of this ruling be needed, see the quotation from Complainant's brief, adopted in full by the late Chief Judge Lewis of this Circuit, then District Judge for the District of Colorado, appearing on page 1017 of his Opinion in Cascade Town Company v. Empire Water & Power Company, 181 F. 1011.

Having cut away the brush on certain preliminary issues, we are confronted with the following ultimate and dispositive facts:

1. That the Carlsbad Caverns National Park was established under and by virtue of the laws of the United States, for the benefit and enjoyment of the public (see 43 Stat. 1929, and 46 Stat. 279, 16 U.S.C.A. § 407 et seq.).

2. On January 23, 1934, Ida May Harrison had a claim with a priority of 1880, to use 5.35 c. f. s. of the flow of Rattlesnake Spring for stock watering and domestic use, and for irrigation of 65.71 acres of land in the vicinity of Rattlesnake Spring.

3. The United States has a right, acquired from Ida May Harrison, on January 23, 1934, with a priority of 1880, to one-half c. f. s. of the flow of Rattlesnake Spring for use at the Carlsbad Caverns National Park, and at Rattlesnake Spring. This right has not been aban-

doned or lost through forfeiture. The one-half cubic feet per second of flow, as above stated, shall not exceed the beneficial use by the Park Service of 105 acre feet per annum.

4. The individual defendants have no right except under the laws of the State of New Mexico, to increase their use of water from the Black River extension of the Carlsbad ground water basin, after its declaration by the New Mexico State Engineer on October 21, 1952.

5. Any rights of the individual defendants to use water from the Black River extension of the Carlsbad ground water basin, are junior to the right of the United States to use water from that Basin flowing from Rattlesnake Spring.

6. The New Mexico Fish and Game Commission, on May 25, 1948, had a claimed priority of 1880 under Declaration No. 0432, to use 92.1 acre feet of the flow of Rattlesnake Spring for the irrigation of 30.7 acres of land. As between the United States and the Commission, however, the right of the United States is superior to that of the Commission, since the right acquired by the Commission was subordinated to the right of the United States when Ida May Harrison, in 1934, conveyed to the United States, the right with a priority of 1880, to use ½ c. f. s. of the flow of Rattlesnake Spring. On May 25, 1948, the Fish and Game Commission had a right with a priority of 1936, under License No. 2096, to use 61.2 acre feet of the flow of Rattlesnake Spring for the irrigation of 20.4 acres of land. The right of the Fish and Game Commission, under Declaration No. 0432 was amended on November 7, 1951, so that 62.958 acre feet of that right could be used in duck ponds, and the remaining 29.142 acre feet could be used to irrigate the remaining 10.714 acres.

Even though, as above stated, waste, non-user and abandonment are not bars to plaintiff's cause of action, they nevertheless should be considered by the Court in connection with the granting of equitable relief. At present, there is no threat of loss of available water to any of the parties hereto, nor does there appear that such shortage will occur in the foreseeable future. There is not a sufficient showing in the trial on the merits of this cause, that great and irreparable damage will result to the United States at the present time, or in the foreseeable future. See La Mesa Community Ditch v. Applezoeller, 19 N.M. 75, 140 P. 1051; Sierra Electric Coop v. Town of Hot Springs, 51 N.M. 150, 180 P.2d 244; Zellers v. Huff, 55 N.M. 501, 236 P. 2d 949; and Hale v. Farmers' Electric, 44 N.M. 131, 99 P.2d 454.

The Court, before granting Injunctive Relief herein, requires that the Government first, drill a shallow well in the immediate area of Rattlesnake Spring, or at such other place as plaintiff deems feasible, and add this water to that pumped to the Cavern and to the Flumes used for irrigation of land, and second, to exercise its best conservation practices regarding cleaning of the wells and flumes. Lastly, the Court requires the measurement, with precision, of the water used from Rattlesnake Spring by the Park Service, the Game Commission and the individual defendants. The parties are urged to work out a practical plan in this regard. Accurate measurement should be continued for one year, at a minimum. If the parties are unable to agree as to the method for this measurement of the flow from Rattlesnake Spring to all the parties hereto, the Court will be constrained to, itself, formulate such a program.

In the event the attendance of the public at the Caverns approach the hoped-for 750,000 by 1966, and the Department of Interior plans on effectuating its now blueprint stage "Mission 66 Program", it will in all probability be necessary for the Government to exercise its right of eminent domain, and condemn present water rights.

This Opinion will constitute the Court's Findings of Fact and Conclusions of Law. All Findings of Fact and Conclusions of Law submitted by any party hereto, in conflict herewith, are hereby denied, and the Court will entertain

forms of Judgment from the parties in conformity herewith, as soon as the same may be prepared, and at any rate, prior to June 30, 1960. Upon the entry of such Judgment, this case will be retired, but may be reopened in the future upon proper application of any party litigant hereto.